**Herman CHANG, Patrick Conners, William Guthrie, Warren Parkhurst, John Register, and John Woodward, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 377–86C.

United States Claims Court.

Nov. 4, 1987.

**556**

Harry H. Walsh, III, Huntsville, Tex., for plaintiffs. Malone, Walsh & Wright and T. Gerald Treece, Houston, Tex., of counsel.

Paul J. Ehlenbach, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Marilyn E. Muench, Chief Counsel, William B. Hoffman, Atty.–Advisor, Office of Foreign Assets Control, and D. Brian Hufford, Atty.–Advisor, Dept. of the Treasury, of counsel.

## OPINION

WIESE, Judge.

Plaintiffs are six individuals who were working in Libya under private employment contracts when the President imposed economic sanctions on that country by Executive Order in January 1986. The sanction orders and accompanying regulations prohibited United States persons[1] from, among other things, performing commercial contracts with Libyan entities without first obtaining the approval of the United States Government. Plaintiffs allege that this regulatory scheme destroyed the value of their employment contracts and thereby effected a taking of property for which just compensation is due them under the Fifth Amendment.

The case is before the court on defendant's motion to dismiss for failure to state a claim and plaintiffs' opposition thereto. Briefs have been filed, and oral argument has been heard. The court now grants the Government's motion.

## FACTS

On January 7, 1986, the President imposed broad economic sanctions upon Libya in retaliation for that country's role in promoting international terrorism. The sanctions, which amounted to a general ban on commercial transactions with Libya absent Government approval, were outlined in two Executive Orders—No. 12543, 51 Fed.Reg. 875 (Jan. 9, 1986), and No. 12544, 51 Fed. Reg. 1235 (Jan. 10, 1986)—and were issued pursuant to the President's authority under

---

1. As used in the text, the term "United States persons" includes citizens of the United States, permanent resident aliens and corporations in- corporated in the United States. 31 C.F.R. § 550.308 (1986).

the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.* (1982). The orders directed the Secretary of the Treasury to promulgate regulations to carry out the sanctions. Those provisions were issued on January 10, 1986 as the Libyan Sanction Regulations, 51 Fed.Reg. 1354–1359, and were eventually published at 31 C.F.R. 550 (1986).

Subpart B of the regulations set forth a list of prohibited commercial activities in Libya. The section most relevant to this litigation provides as follows: "Except as authorized, no U.S. person may perform any contract in support of an industrial or other commercial or governmental project in Libya." 31 C.F.R. § 550.205. The regulations further prohibit the unauthorized export of goods, technology or services to Libya, § 550.202, unauthorized transactions relating to travel to or from Libya, §§ 550.-203(a), 550.207, and unauthorized transfers of property, including money, from Libyan entities to Americans. § 550.209, § 550.314. The restrictions relevant here took effect on February 1, 1986. § 550.301. Thus, after that date, United States persons were prohibited from engaging in any employment activity in Libya that had not been previously authorized by the Secretary.

The Secretary was empowered to grant two kinds of authorizations or "licenses" to permit Americans to engage in otherwise prohibited transactions. The first type is a "general license," whose requirements are delineated in Subpart E and not relevant to this litigation. Prohibited transactions that do not fall within one of the general license categories may be conducted only under the second type of authorization, a "specific license." § 550.801(b)(1). A specific license is broadly defined as "any license or authorization issued pursuant to this part but not set forth in this part." § 550.311.

The procedure for obtaining a specific license is outlined in Subpart H of the regulations. Essentially, the process consists of the filing of an application form by an interested party, § 550.801(b)(2), followed by a decision by either the Secretary or his designee. §§ 550.801(b)(6), 550.802.

The regulations do not set forth a specific deadline for the Government's ruling on an application.

Plaintiffs are five United States citizens and one resident alien who were working as engineers in Libya under contracts with the Sirte Oil Company, a Libyan corporation, at the time the sanctions were ordered. Each of the contracts was entered into sometime between January 1985 and December 1985. In their complaint, plaintiffs allege that the sanction orders and regulations had the effect of abrogating their rights in employment contracts and thereby accomplished a taking of private property for which just compensation is due.

## DISCUSSION

The Government moves to dismiss the complaint on two grounds. First, defendant argues that the taking claims are not ripe for review because plaintiffs never petitioned the Secretary for a specific license to continue to work in Libya as provided for in the sanction regulations; therefore, the Government contends, it is not possible to tell whether the regulations, as they might ultimately have been applied to plaintiffs, would have had the effect of destroying contractual rights. Second, defendant contends that even if the regulations did effectively frustrate plaintiffs' employment contracts, this interference with contractual rights incident to the lawful imposition of economic sanctions against a hostile foreign power did not constitute a taking of property for public use under the Fifth Amendment. The court addresses these arguments in turn.

### A. The Ripeness Issue

The Government contends that because the Libyan Sanction Regulations provide an avenue for obtaining authorization to engage in otherwise prohibited commercial activity in Libya, plaintiffs must exhaust that licensing procedure before they can allege that the regulations effected a taking of their contractual rights. As a general proposition, the position the Government urges is well taken. However, when con-

sidered in light of the facts of the case, the argument is not appealing. To explain:

■ A basic rule of Fifth Amendment taking law is that a claim to just compensation for an alleged property loss attributed to the effects of Government regulations is not ripe for judicial review "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3117, 87 L.Ed.2d 126 (1985). One of the chief reasons for this finality requirement is that during the administrative review " 'a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional question.' " *Id.* at 187, 105 S.Ct. at 3117 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 297, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981)). Hence, a claim that zoning regulations effect a taking is not ripe until the property owner is denied a variance or other approval to use the property as he desires. *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 106 S.Ct. 2561, 2567–68, 91 L.Ed.2d 285 (1986); *Williamson County,* 473 U.S. at 191, 105 S.Ct. at 3119. Similarly, where a regulatory scheme provides for the issuance of a permit to engage in otherwise prohibited land uses, a plaintiff must actually be denied the permit before he can assert that the regulations constitute a taking. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985). By the same reasoning then, the failure to exhaust available procedures for seeking a license to engage in otherwise prohibited foreign commercial activities would, on the face of things, also preclude a taking claim here.

■ However, the decisions noted above presuppose the existence of a viable procedure for obtaining a variance, permit or license before the property rights at issue are extinguished. From the record presently before the court, it is not clear that such an opportunity was truly afforded the plaintiffs before they were obligated to leave Libya and their contract rights were terminated.

■ As noted, the provisions relevant to plaintiffs' situation were first published in the Federal Register on January 10, 1986, three days after the President's executive order. Because authorized commercial activity in Libya was made unlawful after February 1, 1986, plaintiffs were left with just twenty-one days in which to learn of the special license application procedure, obtain and submit the required forms, and, finally, receive a ruling from the Secretary of the Treasury as to whether they would be permitted to continue working in Libya. All of this activity would had to have taken place at the same time that plaintiffs were preparing for the likely contingency that they would be departing Libya on very short notice. After that departure, plaintiffs contend (and the Government does not dispute the point) an application for a license would have been useless because, by then, their employment relationship in Libya would have been terminated. Thus, plaintiffs argue, the sanction regulations on their face effected a complete destruction of contractual rights.

Even though the process for obtaining a special license was relatively simple and possibly amenable to expedited action, the court cannot conclude, on the basis of the record before it, that plaintiffs had a reasonable chance to avail themselves of the procedure before the February 1 deadline for leaving Libya. While there is nothing in the regulations that forbids issuance of a temporary special license pending full consideration of an application, the Government has presented no evidence to indicate that this was a practical or likely alternative in this situation. Given the time constraints faced by plaintiffs in these particular circumstances, we cannot conclude that the complaint must be dismissed for failure to exhaust the licensing procedure.[2] We

---

2. At oral argument, the Government pointed out that four oil companies had applied for and

therefore move on to address the question of whether the sanction regulations effected a taking of property rights for which just compensation is due.

### B. The Taking Issue

■ In recent years, the Supreme Court has approached the problem of determining when economic regulation rises to the level of a taking by favoring an "ad hoc" analysis of such factors as the character of the Government's action, the economic impact of the regulation on the property owner, and the extent of interference with reasonable, investment-backed expectations. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1985) (citing *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). Applying these factors to the case at hand yields one certain conclusion: there was no compensable taking here.

■ To address first the character of the Government's action, it is settled that a " 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, *see, e.g., United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. While the Court has almost invariably found that the permanent physical occupation of property constitutes a taking, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–38, 102 S.Ct. 3164, 3175–78, 73 L.Ed.2d 868 (1982), "the Court has repeatedly upheld regulations that destroy or adversely affect real property interests." *Keystone Bituminous Coal Ass'n v. De Benedictis*, —— U.S. ——, 107 S.Ct. 1232, 1244 n. 18, 94 L.Ed.2d 472 (1987). Even more to the point, the Supreme Court has consistently noted that private contractual

rights stand on a more fragile footing when it comes to takings analysis than more tangible interests in property. *See Block v. Hirsh*, 256 U.S. 135, 155, 41 S.Ct. 458, 459, 65 L.Ed. 865 (1921) (Holmes, J.) ("The fact that tangible property is also visible tends to give a rigidity to our conception of our rights in it that we do not attach to others less concretely clothed.").

■ In this case, suffice it to say that whatever intrusion on contractual rights was occasioned by the Libyan sanction regulations, it did not arise from a physical occupation of property, but rather from a public program adjusting the benefits and burdens of international commerce and foreign policy. The Supreme Court has made clear that when a program of this type impairs contractual rights, it "does not constitute a taking requiring Government compensation." *Connolly*, 106 S.Ct. at 1026.

That same result obtains when the case is viewed in terms of the economic impact of the regulation upon the plaintiffs. Plaintiffs were denied the opportunity to proceed with the performance of their contracts and thus were temporarily deprived of a source of income. But the harm occasioned does not go beyond that. Significantly, plaintiffs do not say that their services could not be marketed elsewhere; hence it could not be claimed that the frustration of their contracts with Libya permanently deprived them of a substantial economic interest. In short, the situation does not demonstrate that degree of governmental intrusion upon private property interests for which fairness would demand the payment of just compensation.

And this conclusion is all the more valid when plaintiffs' situation is assessed in terms of the reasonableness of their investment-backed expectations. In considering this last analytical factor, we start with the observation that those who enter into employment contracts overseas do so in light of one salient fact of economic life: that their ability to perform and compel per-

received special licenses to wind down their operations in Libya. However, plaintiff asserted—and again the Government did not dispute the point—that each of these licenses was grant-

ed after the American employees of the companies had been evacuated from Libyan soil—a timing which plaintiffs maintain would not have helped their situation.

formance is contingent upon the continuation of friendly relations between nations. As the court noted in *Shanghai Power Company v. United States*, 4 Cl.Ct. 237 (1983), *aff'd*, 765 F.2d 159, *cert. denied*, 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985):

> Americans who trade or travel abroad rely upon the fabric of relationships established between our government and others as the foundation for all rights and privileges that make their enterprises possible. When that fabric is strained or torn, placing some individual interests in jeopardy, it may not be possible to repair it without sacrificing some pre-existing rights. Yet if that fabric is not repaired, such rights would be lost in any case. [*Id.* at 245.]

The possibility of Executive intrusion upon foreign commerce is "part and parcel of the understanding businessmen share about the realities of the marketplace." *Id.* at 247. Indeed, the risk that employment in Libya might be interrupted by tension in the relations between that government and the United States can hardly be said to have been outside the reasonable contemplation of plaintiffs at the time they entered into their employment contracts.

■ For one thing, the International Emergency Economic Powers Act ("IEEPA"), which was passed in 1977, and under which the instant sanctions were promulgated, had been on the books for a decade before plaintiffs entered into their contracts with the Sirte Oil Company.[3] The plain language of the Act granted the President sweeping and unqualified powers to "nullify, void, prevent or prohibit * * * any right, power or privilege in any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B) (1982). Thus, plaintiffs' contracts were "in every sense subordinate to the President's power under the IEEPA." *Dames & Moore v. Regan*, 453 U.S. 654, 674 n. 6, 101 S.Ct. 2972, 2984 n. 6, 69 L.Ed.2d 918 (1981).

Moreover, plaintiffs can hardly claim a reasonable expectation that the President, upon focusing on the issue, would never conclude that it was appropriate to apply the full range of economic sanctions against Libya that he was authorized to impose under the IEEPA. Rather, reason could only have dictated otherwise given the Government pronouncements suggesting an accelerating deterioration of relations with Libya that were already in the public record prior to the time plaintiffs entered into their employment contracts. *See, e.g.*, Executive Order No. 12538, 50 Fed.Reg. 47,527 (1985) (banning all imports of Libyan oil "considering that the Libyan government actively pursues terrorism as an instrument of state policy"); Proclamation No. 4907, 47 Fed.Reg. 10,507 (1982) (banning imports of Libyan crude oil); Public Notice No. 787, 46 Fed.Reg. 60,712 (1981) (invalidating American passports to travel in Libya in light of "imminent danger to the physical safety of Americans traveling to or present in Libya").

Finally, any doubts as to plaintiffs' expectations about the uncertainties of foreign commerce are resolved against them by the terms of the employment contracts themselves. According to the complaints, the contracts contained a clause relieving the parties of their duties to perform in the event that plaintiffs were unable to retain work visas from the Libyan government. If plaintiffs were sufficiently aware of the possibility that relations between Libya and the United States might deteriorate to the point where Libya might order them to leave, they can hardly profess ignorance of the corresponding possibility that the United States might find it necessary to call them home in defense of American foreign policy interests—or indeed for their own protection.

The court can find nothing in the facts of plaintiffs' situation that would support a conclusion that they entered into their contracts with a *reasonable* expectation that the necessities of foreign affairs would

---

**3.** Prior to passage of the IEEPA, the President was given similar powers under the Trading with the Enemy Act, 50 U.S.C.A.App. § 1–44 (1982).

never intrude upon them. All indications were to the contrary.

As to the decision upon which plaintiffs primarily rely, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed. 2d 815 (1981), that case can offer them little comfort. The allegation which the plaintiff raised in *Monsanto* was that the Government had effected a taking of its trade secrets by disclosing certain data concerning pesticides which the company had submitted to a Government agency in the expectation that it would be kept confidential. Noting that a "reasonable investment-backed expectation must be more than a 'unilateral expectation or abstract need,'" *id.* at 1005–06, 104 S.Ct. at 2874 (citation omitted), the Court held that a reasonable expectation of confidentiality arose only during the period between 1972 and 1978 when the agency had expressly designated the submitted data as a trade secret in the applicable submission forms. *Id.* at 1013, 104 S.Ct. at 2878. Thus, the case illustrates the very point that is missing here: a *reasonable* basis for assuming non-interference from Government action.

## CONCLUSION

For the reasons stated, the Government's motion to dismiss is granted; the Clerk is directed to enter judgment accordingly.