Herman CHANG, Patrick Conners, William Guthrie, Warren Parkhurst, John Register and John Woodward, Plaintiffs–Appellants,

v.

The UNITED STATES,
Defendant–Appellee.

No. 88–1120.

United States Court of Appeals,
Federal Circuit.

Oct. 13, 1988.

T. Gerald Treece, Houston, Tex., argued for plaintiffs-appellants. With him on the brief was Harry H. Walsh, III, Huntsville, Tex.

Terrence S. Hartman, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director and Paul J. Ehlenbach, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., were on the brief for defendant-appellee. Also on the brief were Marilyn L. Muench, Chief Counsel, William B. Hoffman, Attorney–Advisor, Office of Foreign Assets Control and D. Brian Hufford, Attorney–Advisor, Dept. of the Treasury, of counsel.

Before NIES, ARCHER and MICHEL, Circuit Judges.

MICHEL, Circuit Judge.

Mr. Herman Chang and the five other individuals named in the complaint (plaintiffs) appeal the judgment of the United States Claims Court in *Chang v. United States*, 13 Cl.Ct. 555 (1987), granting the government's motion to dismiss their complaint for failure to state a claim upon which relief could be granted. We affirm.

### Background

Plaintiffs were working as petroleum engineers in Libya under private, written employment contracts entered into in 1985

with Sirte Oil Company (Sirte), a Libyan corporation. In January 1986, President Reagan declared a national emergency because of a threat to the national security and foreign policy of the United States posed by the policies and actions of the Libyan government, and he imposed economic sanctions on Libya in retaliation for that country's role in promoting international terrorism. *See* Exec.Order No. 12543, 51 Fed.Reg. 875 (Jan. 9, 1986); Exec.Order No. 12544, 51 Fed.Reg. 1235 (Jan. 10, 1986). The executive orders were issued pursuant to the President's delegated authority under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (1982). The executive orders also authorized and directed the Secretary of the Treasury (Secretary) to promulgate regulations to implement the sanctions. Those regulations, entitled the Libyan Sanction Regulations, were issued by the Secretary at 51 Fed.Reg. 1354–59 (Jan. 10, 1986) (published at 31 C.F.R. § 550 (1986)).

Most important to the present appeal was the executive order provision codified at 31 C.F.R. § 550.205, which provided: "Except as authorized, no U.S. person may perform any contract in support of an industrial or other commercial or governmental project in Libya." Each of the plaintiffs in this case falls within the definition of "United States person" set forth in 31 C.F.R. § 550.308 as "any United States citizen, permanent resident alien, juridical person organized under the laws of the United States, or any person in the United States."

The above regulations affecting the plaintiffs' employment contracts were effective as of February 1, 1986. Under 31 C.F.R. § 550.701, willful violations of any provision of the regulations were subject to the penalties set forth in section 206 of the IEEPA, 50 U.S.C. § 1705, which included fines of as much as $50,000 and/or imprisonment for as long as 10 years. The plaintiffs chose to comply with the regulations and returned to the United States on or by February 1, 1986.[1]

The plaintiffs filed their complaint in the Claims Court on June 16, 1986, alleging that the termination and irretrievable loss of their employment contracts with Sirte, which was the practical result of the enactment of the Libyan Sanction Regulations by the United States government, was a taking under the Fifth Amendment for which they were owed just compensation. The Claims Court granted the government's motion to dismiss for failure to state a claim upon which relief could be granted. 13 Cl.Ct. 555, 561 (1987).

## OPINION

### I.

As this court has recently stated, "a motion for judgment on the pleadings should be granted only where 'it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim.'" *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir.1988) (citation omitted). "[I]n reviewing the grant of a judgment for the defendant on the pleadings, we must assume each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant." *Id.* This same standard of review applies where a case is dismissed because the complaint fails to state a claim upon which relief could be granted. *See Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 1320–22 (Fed.Cir.1983).

### II.

The Fifth Amendment provides, in part pertinent to this appeal: "nor shall private property be taken for public use, without just compensation." U.S. Const.

---

1. The regulations did contain provisions under which the Secretary could authorize, through issuance of "licenses," otherwise prohibited activities or transactions. *See* 31 C.F.R. §§ 550.801–.802. The Claims Court ruled, however, that the plaintiffs were not reasonably able to avail themselves of the licensing procedure prior to the February 1, 1986 deadline for leaving Libya, and thus were not precluded from maintaining this action as a result of their having not sought licenses. 13 Cl.Ct. at 558. That finding is not challenged by the government in this appeal.

Amend. V. The Supreme Court has noted that the language of the Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987). "[T]he Amendment makes clear that it is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.* at 2386 (emphasis in original). Furthermore, the Amendment is also designed " 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).

The Supreme Court has also made clear that there is no " 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659 (citation omitted). As a result, "[o]rdinarily [courts] must engage in 'essentially ad hoc, factual inquiries.' " *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed. 2d 868 (1982) (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659). Thus, whether a particular governmental interference with property is a compensable taking requires a case-by-case factual analysis of the particular circumstances presented. *See, e.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979); *Belk v. United States*, 858 F.2d 706, 709 (Fed. Cir.1988).

There is no question that "[v]alid contracts are property, whether the obligor be a private individual, ... or the United States." *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). However, as the Supreme Court observed in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 223–24, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986):

> "Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Norman v. Baltimore & Ohio R. Co.*, 294 U.S. 240, 307–308, 55 S.Ct. 407, 415–416, 79 L.Ed. 885 (1935).

If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking. *Bowles v. Willingham*, 321 U.S. 503, 517, 64 S.Ct. 641, 648, 88 L.Ed. 892 (1944); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508–510, 43 S.Ct. 437, 438, 67 L.Ed. 773 (1923).

But as the Supreme Court also recognized in *Connolly*, "[t]his is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation." 475 U.S. at 224, 106 S.Ct. at 1026.

To guide the necessary analysis into whether the questioned governmental activities impair a valid contract to such a degree as to constitute a compensable taking, the Court in *Connolly* identified three factors as having " 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.' " *Id.* at 225, 106 S.Ct. at 1027 (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct.

at 1026).[2]

We observe that in applying the *Connolly* factors, the focus of our inquiry is not whether the policies and actions of the Libyan government were such that the President properly invoked his power and imposed sanctions. Rather, the proper focus when considering the *Connolly* factors concerns whether the President's actions amount to a "taking." In other words, the "governmental action" relevant to the plaintiffs' claim here is not that which served as the basis for the alleged taking, but that which is alleged to constitute the taking. Thus, no discovery of the "true facts" underlying the Libyan crisis need be undertaken as plaintiffs suggest.

Plaintiffs do not contend that President Reagan did not in fact declare a national emergency, and they even concede on appeal that the President has the power to take private property for public use under the IEEPA once a national emergency is declared.[3] *See* Exec.Order No. 12543; *cf. Dames & Moore v. Regan*, 453 U.S. 654, 662–63 & n. 1, 101 S.Ct. 2972, 2977–89 & n. 1, 69 L.Ed.2d 918 (1981).

### III.

A. With regard to the "character of governmental action," the government did not appropriate to the public use, i.e., "take" either the plaintiffs' employment contracts or the plaintiffs' services. *Cf. Brooks–Scanlon Corp. v. United States*, 265 U.S. 106, 120, 44 S.Ct. 471, 473, 68 L.Ed. 934 (1924) (where the government "put itself in the shoes of the claimant and ... appropriated to the use of the United States all the rights and advantages that an assignee of the contract would have had"). In fact, the government's actions only prevented the plaintiffs from marketing their services in Libya, and their complaint contains no allegation that they were blocked from marketing their services elsewhere. *See* 13 Cl.Ct. at 559. Even accepting the plaintiffs' argument, belatedly made in their brief on appeal, that the depressed oil industry in the United States combined with their seniority made it impossible for them to find work within that industry at any rate of pay, we conclude that the loss of their contracts with Sirte is not the equivalent of an appropriation of their services by the United States government.

The fact that the plaintiffs were frustrated in making the most beneficial use of their services does not lead to the unavoidable conclusion that the governmental action rises to the level of a taking. *See, e.g., Nollan v. California Coastal Commission*, —— U.S. ——, 107 S.Ct. 3141, 3146, 97 L.Ed.2d 677 (1987) ("land use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land'" (citation omitted)); *Penn Central*, 438 U.S. at 125, 98 S.Ct. at 2659 (citing cases in which government regulation has been viewed as permissible governmental action even when prohibiting the most beneficial use of property). Here, it cannot be disputed that the imposition of the Libyan Sanction Regulations substantially advances legitimate state interests. Furthermore, the plaintiffs remain able to

**2.** As this court recently observed in *Sperry Corp. v. United States*, 853 F.2d 904, 906 (Fed.Cir. 1988), the multifactor test outlined in *Connolly* is not invoked when there is a permanent physical occupation of property, which can be viewed as a *per se* taking (citing *Loretto*, 458 U.S. at 432–33, 102 S.Ct. at 3174). However, in the present circumstances, since there was no physical invasion, occupation, or appropriation of the plaintiffs' property by the government, it is appropriate to rely, as the Claims Court did, on the multifactor test of *Connolly*. *See infra* Part III.

**3.** Furthermore, to the extent that the plaintiffs' inquiry into the "true facts" of the Libyan crisis would seek to examine the President's motives and justifications for declaring a national emer-gency, such an inquiry would likely present a nonjusticiable political question. *See Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 3038, 82 L.Ed.2d 171 (1984); *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962); *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948); *Belk*, at 710; *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 795–96 (Fed.Cir.1984); *see also Beacon Products Corp. v. Reagan*, 633 F.Supp. 1191, 1195 (D.Mass.1986) (whether Nicaragua poses a sufficient threat to trigger the President's IEEPA powers is a nonjusticiable political question), *aff'd*, 814 F.2d 1 (1st Cir.1987).

market their "services" in industries other than the oil industry and in countries other than Libya. Any differences in the rate of compensation for those services result from the marketplace forces within the industry or country of subsequent employment, not the government's enactment of the regulations giving rise to the present action.

■ B. With respect to the extent to which the Libyan Sanction Regulations are alleged to have interfered with distinct investment-backed expectations of the plaintiffs, we note that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The plaintiffs allege that each of them intended—i.e., expected—their employment with Sirte to be their last position prior to retirement and that each intended to work for Sirte for at least 10 years or until that retirement. However, as the Claims Court observed, "those who enter into employment contracts overseas do so in light of one salient fact of economic life: that their ability to perform and compel performance is contingent upon the continuation of friendly relations between nations." 13 Cl.Ct. at 559–60; *see also Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 245 (1983), *aff'd*, 765 F.2d 159 (Fed.Cir.1985), *cert. denied*, 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985).

■ The Constitution explicitly grants to Congress "the power to regulate commerce with the foreign nations." U.S. Const. art. I, § 8, cl. 3. As the Claims Court recognized in the present case, the plain language chosen by Congress in the IEEPA delegated to the President "sweeping and unqualified powers to 'nullify, void, prevent or prohibit ... any right, power or privilege in any property in which any foreign country or a national thereof has any interest.'" 13 Cl.Ct. at 560 (quoting 50 U.S.C. § 1702(a)(1)(B) (1982)). "Thus, plaintiffs' contracts were 'in every sense subordinate

to the President's power under the IEEPA.'" 13 Cl.Ct. at 560 (quoting *Dames & Moore*, 453 U.S. at 674, 101 S.Ct. at 2983 n. 6). As the Supreme Court set forth in *Knox v. Lee*, 79 U.S. (12 Wall.) 457, 551, 20 L.Ed. 287 (1870), a valid governmental exercise of its constitutional power to regulate commerce with foreign nations[4] can have the consequential effect of altering the obligations of preexisting contracts without giving rise to a taking:

A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? ... [W]as it ever imagined this was taking private property without compensation or without due process of law?

As further support for its conclusion, the Claims Court relied on the overwhelming public knowledge of strained and deteriorating relations between the two countries existing at the time when the plaintiffs entered their contracts with Sirte, and indicating the foreseeability of the risk of disruption in the relations between the United States and Libya. 13 Cl.Ct. at 560. The Claims Court concluded, based on this public evidence, that there could be no reasonable expectation by the plaintiffs in 1985 that their contracts would proceed without possible hindrance from the intrusion of foreign affairs. 13 Cl.Ct. at 560–61. When dealing in foreign commerce, the possibility of changing world circumstances and a corresponding response by the United States government can never be completely discounted. *Cf. Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106, 111–12 (2d Cir.), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).

Furthermore, even if plaintiffs' expectations of continued relations with Libya were reasonable, it is difficult to identify

---

**4.** *See also Norman*, 294 U.S. at 306–10, 55 S.Ct. at 415–17 (Congress' nullification of a contract clause requiring payment of money obligations in gold was within its power to regulate currency and thus was not a taking); *Louisville &* *Nashville Railroad Co. v. Mottley*, 219 U.S. 467, 482, 31 S.Ct. 265, 270, 55 L.Ed. 297 (1911) (passenger's contract with railroad was subject to the interstate commerce power and could be invalidated without compensation).

the plaintiffs' "investment" underlying their expectations with respect to their contracts. This is not the usual "investment" situation where the plaintiffs have purchased or developed property and subsequently been denied the right to use it in an economically viable manner as contemplated at the time of purchase or development. *See First English Evangelical*, 107 S.Ct. at 2381–82; *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985); *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Penn Central*, 438 U.S. at 115–18, 98 S.Ct. at 2654–56. We have considered plaintiffs' assertions regarding the development of their expertise and sale of real and personal property in anticipation of an extended stay in Libya, but find those assertions unpersuasive.

C. Finally, as to the severity of the economic impact of the sanctions on the plaintiffs, we accept as true the plaintiffs' contention that their Libyan jobs were the highest paying positions that they would be able to obtain, either within or outside the oil industry. However, their employment contracts with Sirte were purely executory as to the respective future obligations of each party. Furthermore, the contracts were not for a fixed period, and each contract could be terminated at the option of the employee or upon the failure or inability to maintain the necessary Libyan work or residence visas. Most importantly, the plaintiffs do not complain that the sanctions resulted in a loss of income for services previously provided but not yet paid for, merely the loss of the contingent right to future income for services yet to be rendered. *Cf. Dames & Moore*, 453 U.S. at 664, 101 S.Ct. at 2978 (petitioner owed for services rendered prior to termination). Such future damages are speculative and merely consequential to the valid exercise of governmental power. *See Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) ("loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim"); *Kearney & Trecker Corp. v. United States*, 231 Ct.Cl. 571, 688 F.2d 780, 783–

784 (1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 929 (1983) (where government required contractor to expedite delivery of machine and such requirement frustrated sale to third party pursuant to contract between contractor and the third party, there was neither a compensable taking of the machine nor of the contract with the third party but merely a frustration of expectations).

### CONCLUSION

For these reasons, the dismissal of the plaintiffs' complaint for failure to state a claim upon which relief could be granted is

AFFIRMED.