**767 THIRD AVENUE ASSOCIATES and Sage Realty Corporation, Plaintiffs–Appellees,**

v.

**PERMANENT MISSION of The REPUBLIC OF ZAIRE to the UNITED NATIONS, Defendant–Appellant.**

**No. 61, Docket 92–7184.**

United States Court of Appeals, Second Circuit.

Argued Sept. 4, 1992.

Decided March 4, 1993.

Jeffrey M. Rubin, New York City (Rubin & Shang, of counsel), for appellant.

Joseph Ferraro, New York City (Robert J. Ward, Jean–Marie L. Atamian, Shea & Gould, of counsel), for appellee.

M. Chinta Gaston, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., James L. Cott, Asst. U.S. Atty., S.D.N.Y., Edwin D. Williamson, Legal Adviser, Bruce Rashkow, Asst. Legal Adviser, Richard K. Lahne, Attorney Adviser—Dept. of State, of counsel), for U.S. as Amicus Curiae.

Before: FEINBERG, NEWMAN and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal emerges out of a landlord-tenant dispute. When the Zaire mission to the United Nations occupying leased space on the east side of midtown Manhattan repeatedly fell into arrears on its rent, it was sued by its landlord. The tenant's defense against being evicted was diplomatic immunity. A district court refused to credit this defense and instead granted summary judgment to the landlord for back rent and also awarded it possession of the premises, ordering United States Marshals to remove the Mission physically if it failed to vacate in a timely manner.

Enforcement of an owner's common law right to obtain possession of its premises upon the tenant's non-payment of rent may not override an established rule of international law. Nor under the guise of local concepts of fairness may a court upset international treaty provisions to which the United States is a party. The reason for this is not a blind adherence to a rule of law in an international treaty, uncaring of justice at home, but that by upsetting existing treaty relationships American diplomats abroad may well be denied lawful protection of their lives and property to which they would otherwise be entitled. That possibility weighs so heavily on the scales of justice that it militates against enforcement of the landlord's right to obtain possession of its property for rental arrears.

## BACKGROUND

Plaintiffs, 767 Third Avenue Associates, are a partnership owning a building at 767 Third Avenue in Manhattan, and its managing agent, Sage Realty (collectively plaintiffs, landlord or Sage Realty). The defendant is the Permanent United Nations Mission of the Republic of Zaire (Mission, Zaire, tenant or appellant), a tenant in the building. The landlord-tenant relationship began on May 19, 1982 when Sage Realty and Zaire entered into a ten-year lease for all of the 25th floor at 767 Third Avenue. The building is conveniently located near the United Nations Headquarters in New York City. In 1987 a dispute arose when Zaire failed to make its rental payments. Sage Realty sued and obtained a default judgment in August 1989 terminating Zaire's lease. Under the judgment plaintiffs were awarded possession and $244,-157.49 in damages. After Zaire paid the damage award, plaintiffs allowed it to continue in the premises on a month-to-month basis at a rental of $19,350 per month.

When in 1991 the Mission again defaulted in its rental payments, plaintiffs notified it on April 26 that they were terminating the mission's month-to-month tenancy. On July 22 the landlord sued Zaire in the Southern District seeking unpaid rent, attorneys' fees and possession. On November 14, 1991 the district court granted plaintiffs summary judgment, directed the Mission to vacate the premises, and awarded plaintiffs damages of $387,154.72 through October 31 and $832.19 for each day after November 1, 1991 that the Mission occupied the premises. In addition the district court directed the U.S. Marshal to remove the Mission if it refused to vacate the 767 Third Avenue space. Because the order did not specify the date by which Zaire was to vacate, the district court issued a supplemental order on January 15, 1992, identical to its earlier November 14, 1991 judgment, but now adding a direction for the U.S. Marshal to remove the Mission and its belongings from the premises physically if Zaire did not leave by January 31, 1992.

The Zairian Mission subsequently sought a stay of this order, and in a March 24, 1992 opinion the trial court granted a limited stay until April 20, 1992—in order to avoid a "hasty eviction" and to permit the Mission to protect the confidentiality of its papers—but refused a more extended stay pending appeal on the grounds that none of the treaties invoked by the Mission or the Foreign Sovereign Immunities Act of 1976 (Act), 28 U.S.C. §§ 1602–1611 (1988), provided support for appellant's position or demonstrated the likelihood of its success on the merits.

The parties have stipulated that enforcement of the district court's eviction order is stayed pending resolution of this appeal.

Due to the United States State Department's intervention—including numerous meetings between U.S. officials, the United Nations Legal Counsel, and Zaire's Charge d'Affaires Lukabu Khabouji N'Zaji, and a March 13, 1992 ultimatum to the Mission that two Zairian officials and their families would be expelled from the United States if Zaire did not pay the damages due—Zaire paid its rental arrears in full by three checks sent to Sage Realty on April 9, 23, and 27, 1992. Since that time, Zaire has again lagged in its payments because of the continuing financial crisis in that country. Sage Realty insists that it wants the Mission evicted from its building, even though it appears the parties are continuing to negotiate a new lease.

Zaire appeals from the district court's final judgment of January 15, 1992 granting the landlord summary judgment that awarded damages and directed its physical removal from its leased premises by U.S. Marshals. The United States has filed an *amicus* brief and appeared in support of the Mission.

## DISCUSSION

### I  Inapplicability of Foreign Sovereign Immunities Act

The inviolability of a United Nations mission under international and U.S. law precludes the forcible eviction of the Mission. Applicable treaties, binding upon federal courts to the same extent as domestic statutes, *see Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 260–61, 104 S.Ct. 1776, 1786–87, 80 L.Ed.2d 273 (1984); *United States v. Palestine Liberation Org.*, 695 F.Supp. 1456, 1464 (S.D.N.Y. 1988), establish that Zaire's Permanent Mission is inviolable. The district court erred in misinterpreting the applicable treaties and in carving out a judicial exception to the broad principle of mission inviolability incorporated in those agreements.

Although the United States' support for appellant is based solely on a number of relevant treaties, the district court rested its decision in part on an interpretation of the Foreign Sovereign Immunities Act,

28 U.S.C. §§ 1602–1611 (1988). That Act deserves brief discussion since the landlord continues to raise its provisions. While Sage Realty correctly asserts that Congress aimed to permit courts to make sovereign immunity determinations, *see id.* § 1602, plaintiffs give short shrift to the Act's explicit provision that it operates "[s]ubject to existing international agreements to which the United States is a party." *Id.* § 1609. Because of this provision the diplomatic and consular immunities of foreign states recognized under various treaties remain unaltered by the Act. *See Mashayekhi v. Iran*, 515 F.Supp. 41, 42 (D.D.C.1981) ("Under the FSIA ..., what were then 'existing international agreements' remain[] valid and superior to the FSIA wherever terms concerning immunity contained in the previous agreement conflict with the FSIA."); *see also* 14 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3662, at 393 (2d ed. 1985) (the FSIA was "not[] intended to alter either diplomatic or consular immunity"). Since international agreements entered into by the United States control the protections that must be accorded to and the obligations owed to the Mission by the United States, the Act does not govern our decision.

### II  International Agreements

#### A.  Generally

The international agreements presented us and relied upon by the United States all pre-date the Foreign Sovereign Immunities Act. They include the United Nations Charter, 59 Stat. 1031 (1945), the Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, June 26–Nov. 21 1947, 61 Stat. 754, 756 [hereafter the U.N. Headquarters Agreement], the Convention on the Privileges and Immunities of the United Nations, *adopted* Feb. 13, 1946, 21 U.S.T. 1418 [hereafter the U.N. Convention on Privileges and Immunities], and the Vienna Convention on Diplomatic Relations, *done* Apr. 18, 1961, 23 U.S.T. 3227 [hereafter the Vienna Convention].

The first three of those treaties provide for various diplomatic protections and immunities without specific reference to mission premises. The U.N. Charter, for example, provides "[r]epresentatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization." U.N. Charter, *supra*, Art. 105(2). The U.N. Headquarters Agreement states that representatives of member states "shall, whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities ... as it accords to diplomatic envoys accredited to it." U.N. Headquarters Agreement, *supra*, Art. V(4). The Convention on Privileges and Immunities of the United Nations recites in somewhat more detail that representatives of member states shall "enjoy the following privileges and immunities: (a) immunity from personal arrest or detention ...; (b) inviolability for all papers and documents; ... (g) such other privileges, immunities and facilities not inconsistent [with] the foregoing as diplomatic envoys enjoy...." U.N. Convention on Privileges and Immunities, *supra*, Art. IV, § 11.

### B. Vienna Convention

While these Treaty provisions standing alone shed little light on the immunities granted a permanent mission, the 1961 Vienna Convention speaks directly to the issue of mission premises. Article 22 of that Convention declares:

1. The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission

Article 22, section 2 of the Vienna Convention goes on to note a host state's "special duty" to protect "the premises of the mission" from "any intrusion or damage" and "prevent any disturbance of the peace of the mission or impairment of its dignity"; Article 22, section 3 further states that the premises of a mission shall be immune from "search, requisition, attachment or execution." Mission premises covered by the Convention include both owned and leased property. *See Report of the International Law Commission*, Diplomatic Intercourse and Immunities, U.N. GAOR, 13th Sess., Supp. 9, U.N. Doc. A/3859 (1958), *reprinted in* [1958] II Y.B. Int'l L. Comm'n 89, 95, U.N. Doc. A/CN.4/SER.A/1958/Add.1

The other treaties referred to above are consistent with the Vienna Convention's broad interpretation of inviolability, and support the notion that the United States and the United Nations recognize extensive immunity and independence for diplomats, consulates and missions abroad. But because the Vienna Convention remains the most applicable of the treaties cited, our discussion centers on it.

With that connection as a starting predicate, we observe that the district court's judgment—and Sage's arguments supporting it—fail to take into full account the plain language of Article 22. That language contains the advisedly categorical, strong word "inviolable" and makes no provision for exceptions other than those set forth in Article 31, which are irrelevant to our discussion because they relate to personal activities not carried out on behalf of the sending state. Instead of interpreting the deliberately spare text of the Vienna Convention, the district court read into it an exception of its own making. It first observed that "the notion of protection from eviction from privately owned leased premises was not specifically addressed by any of the treaties." This statement is correct so far as it goes. But we part company with the district court when— using that statement as a foundation—it improperly concluded that this case must therefore fall under an unspecified exception to the rule safeguarding a mission's inviolability.

As the United States correctly points out, the drafters of the Vienna Convention considered and rejected exceptions, opting instead for broad mission inviolability. For instance, one proposal in an early Convention draft offered an exception to the prohibition on any non-consensual entry by the receiving state. The exception posed was

one to be strictly limited to emergencies presenting "grave and imminent risks" to life, property or national security. *See Diplomatic Intercourse and Immunities,* Projet de codification du droit relatif aux relations et immunites diplomatiques, U.N. Doc. A/CN.4/91, *reprinted in* [1955] II Y.B. Int'l L. Comm'n 9, 11, U.N. Doc. A/CN.4/SER.A./1955/Add.1. This proposed exception that would have altered the rule of mission inviolability then existing under customary international law, *id.* at 16, was not adopted. The 1957 draft of the article covering the subject of mission inviolability rejected the proposed exception, and this exception never resurfaced in later drafts. *See Report of the International Law Commission,* Diplomatic Intercourse and Immunities, U.N. GAOR, 12th Sess., Supp. 9, U.N. Doc. A/3223 (1957), *reprinted in* [1957] II Y.B. Int'l L. Comm'n 131, 136, U.N. Doc. A/CN.4/SER.A/1957/Add.1 [hereafter *1957 Report of Int'l Law Comm'n*]. The commentary to the draft article that was ultimately adopted explicitly emphasized the lack of exceptions to inviolability, stating "the receiving State is obliged to prevent its agents from entering the premises for any official act whatsoever." *Id.* at 137. Nothing could be stated more plainly.

### C. History Leading to Vienna Convention

History supports the concept of inviolability expressed in Article 22. Among the laws of nations is the notion that ambassadors must be received and that they must suffer no harm. *Diplomatic Intercourse and Immunities,* Memorandum prepared by the Secretariat, U.N. Doc. A/CN.4/98, *reprinted in* [1956] II Y.B. Int'l L. Comm'n 129, 132, U.N. Doc. A/CN.4/SER.A/1956/Add.1 [hereafter *Secretariat Memorandum*]. Beginning 1000 years ago when merchants went to foreign lands seeking trade, they sought to have their disputes settled by judges of their choice administering their own national laws. In 1060, for example, Venice was granted the right to send magistrates to Constantinople to try Venetians charged in civil and criminal cases. *1957 Report of Int'l Law Comm'n, supra,* at 73. A similar process occurred in the western part of the Mediterranean basin where special magistrates called "consul judges" were appointed to settle disputes between foreign traders and local merchants. *Id.* at 74. Because of the growth of international trade the use of consuls spread. By 1251 Genoa had a consul in Seville and in 1402 there were consuls of the Italian republics in London and the Netherlands. Before the end of the fifteenth century England had consuls in Italy and Scandinavia. *Id.*

In the 16th and 17th centuries individual states took over from traders the task of sending consuls, and the function of the consul was dramatically altered. Judicial duties were eliminated and replaced by the diplomatic functions of looking after the state's interests in trade, industry and shipping. As official state representatives, consuls enjoyed corresponding privileges and immunities. By the 18th century all the major trading states had exchanged consuls. The United States set up its first consulate in France in 1780. *Id.* at 75.

Because of the extraordinary growth of consulates during the 19th century, attempts to codify the rules of international law on that subject began in the 20th century. *Id.* at 77–78. A forerunner of these attempts was the Congress of Vienna in 1815. Rosalyn Higgins, Editorial Comment, *The Abuse of Diplomatic Privileges and Immunities: Recent United Kingdom Experience,* 79 Am.J.Int'l L. 641, n. 3 (1985) [hereafter Higgins, *Abuse of Diplomatic Privileges*]. In 1927 the Inter-American Commission of Jurists prepared a draft of 26 articles on consuls, which served as the basis for the Convention regarding Consular Agents signed at Havana, Cuba on February 28, 1928. In 1932 Harvard Law School prepared drafts of conventions for the codification of international law on diplomatic privileges and immunities. The International Law Commission added the subject "consular intercourse and immunities" to those selected for codification at the first session of the United Nations Secretariat in 1949, which the General Assembly approved, and began

by the usual appointment of a Special Rapporteur on this question. *See 1957 Report of Int'l Law Comm'n, supra,* at 82. The study continued from 1956 to 1959 and his commentary provided the foundation work leading to the 1961 Vienna Convention at which 81 nations participated. Higgins, *Abuse of Diplomatic Privileges, supra,* at 641 n. 3.

■ The Vienna Convention entered into force April 24, 1964. One hundred and thirteen member states have ratified it, including the United States on December 13, 1972. *See* Office of the Legal Advisor, U.S. Department of State, *Treaties in Force: A List of Treaties and Other Agreements of the United States in Force on January 1, 1991; Satow's Guide to Diplomatic Practice* 106–09 (Lord Gore–Booth ed., 5th ed. 1988). History establishes beyond question therefore that the Vienna Convention on Diplomatic Relations was intended to and did provide for the inviolability of mission premises, archives documents, and official correspondence. *See Parry & Grant, Encyclopedic Dictionary of International Law* 193 (Clive Parry *et al.* eds., 1988).

### III Inviolability Recognized Without Exception

#### A. Under International Law

■ The fact that the Vienna Convention codified longstanding principles of customary international law with respect to diplomatic relations further supports the view that the Convention recognized no exceptions to mission inviolability. *See* Higgins, *Abuse of Diplomatic Privileges, supra,* at 642 (The Vienna Convention "is agreed to be largely confirmatory of existing customary law."); *Secretariat Memorandum, supra,* at 134. The Convention codified a wide range of diplomatic protections accorded foreign missions over the centuries, *see* Higgins, *Abuse of Diplomatic Privileges, supra,* at 641–42, and recognized the independence and sovereignty of mission premises that existed under customary international law.

Under such law the inviolability of mission premises had become by the 18th century an established international practice, *see Satow's Guide to Diplomatic Practice, supra,* at 106–09, and represented an integral part of the diplomatic privileges, accorded envoys abroad. *See* Francis Deak, *Immunity of a Foreign Mission's Premises From Local Jurisdiction,* 23 Am.J.Int'l L. 582, 587 (1929); 1 L. Oppenheim, *International Law* 793–95 (H. Lauterpacht ed., 8th ed. 1955). The United States and other nations had abided by the inviolability of mission premises long before the Vienna Convention entered into force. *See* IV Green H. Hackworth, *Digest of International Law* 562 (1942) (noting that Foreign Service regulations recognized mission inviolability years before the convention was concluded).

Although diplomatic privilege and mission inviolability arose under various now-outdated theories, including Grotius' notion of the "sacredness of Ambassadors" and the conception of the diplomat as personifying the foreign state's sovereign, *see* Lori J. Shapiro, *Foreign Relations Law: Modern Developments in Diplomatic Immunity,* 1989 Ann.Surv.Am.L. 281, 282 [hereafter Shapiro, *Developments*], modern international law has adopted diplomatic immunity under a theory of functional necessity. *See id.* at 283. Under that doctrine, the United States recognizes the privileges of foreign diplomats in the U.S. with the understanding that American diplomats abroad will be afforded the same protections from intrusions by the host state. The most secure way to guarantee this protection, the United States tells us, is through blanket immunities and privileges without exception.

The risk in creating an exception to mission inviolability in this country is of course that American missions abroad would be exposed to incursions that are legal under a foreign state's law. Foreign law might be vastly different from our own, and might provide few, if any, substantive or procedural protections for American diplomatic personnel. Were the United States to adopt exceptions to the inviolability of foreign missions here, it would be stripped of its most powerful defense, that is, that

international law precludes the nonconsen-· sual entry of its missions abroad. Another related consideration is the frequent existence of a small band of American nationals residing in foreign countries, often business personnel. Recent history is unfortunately replete with examples demonstrating how fragile is the security for American diplomats and personnel in foreign countries; their safety is a matter of real and continuing concern. Potential exposure of American diplomats to harm while serving abroad and to American nationals living abroad is not "pure conjecture," as plaintiffs blithely assert.

The narrow reading of the Vienna Convention urged by Sage Realty and adopted by the district court is inadequately supported. Citing only selective examples of the protection accorded by the Convention and other international agreements, Sage Realty fails to account for the functional necessity of mission inviolability. In a weak attempt to demonstrate that only extreme behavior is covered by Article 22, plaintiffs refer to a 1986 meeting of the U.N. General Assembly urging the suppression of terrorist action against missions and a 1967 U.N. study noting that the U.S. is under an obligation to protect the U.N. headquarters district from "hostile demonstrations" outside mission premises. Similarly, the district court relied upon selected search and seizure type of protections afforded to missions and their documents to insist that only sudden unexpected intrusions are governed by the Convention. However, as explained below, the circumstance of a sudden intrusion is largely beside the point and results in a restricted view of the Vienna Convention at odds with its purport and practice.

### B. Purpose and Practice Under Article 22

■ To begin with, the examples used by the district court do not conflict with the broad language of "inviolability" appearing in the Convention's text, nor do they confute the longstanding international support for mission inviolability. Instead, upon proper analysis, sudden intrusion and protection against search and seizure further support the sanctity of mission premises. Nothing in the commentary to the draft articles suggests that fears about "mob violence" and "unannounced seizures" were ever the main concerns underlying diplomatic immunities, as the district court mistakenly believed. *See, e.g., 1957 Report of Int'l Law Comm'n, supra,* at 137 (emphasizing respect due to a mission, noting that process servers may not even serve papers without entering at the door of a mission because that would "constitute an infringement of the respect due to the mission"). Perhaps most telling, no support may be found for an interpretation of limited inviolability in either the commentary to the Vienna Convention or the scholarly literature concerning the convention and the customary international law principles it codified.

Plaintiffs' position is also refuted by what has occurred in practice. The United States has consistently respected the complete inviolability of missions and consulates. Even in extreme cases U.S. authorities will not enter protected premises without permission following, for example, bomb threats. Nor have local authorities been permitted to enter to conduct health and building safety inspections without the consent of the mission involved. *See, e.g.,* Eleanor C. McDowell, *Digest of United States Practice in International Law 1976* 198–99 (1977). An affidavit from the counselor for Host Country Affairs for the United States Mission to the United Nations attests that after the Soviet mission to the U.N. was bombed in 1979, the FBI and local police officers were all refused entry to the mission until the Soviets consented to allow certain law enforcement officers to enter. Absent such consent, the United States tells us, government officials would not have attempted to enter the Soviet mission's premises.

Additional support for the position we take here is found in decisional law. The Supreme Court has made clear: "When the parties to a treaty both agree to the meaning of a treaty provision, and that interpretation follows from the clear treaty language[, the court] must, absent extraordi-

narily strong contradictory evidence, defer to that interpretation." *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982); *accord In re Air Disaster at Lockerbie, Scotland on December 21, 1988,* 928 F.2d 1267, 1280 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). This case presents such a situation. Treaty language uses the term "inviolability" and the Convention contains no exceptions relevant to this case. Because the United States agrees to an accepted interpretation of the Vienna Convention, and because no evidence appears of a contrary interpretation advanced by any of the United Nation members, all of whom are parties to the Convention, *see* G.A. Res. 41/78, U.N. GAOR, 41st Sess., Supp. No. 53, at 260, U.N. Doc. A/41.53 (1986) (General Assembly resolution emphasizing inviolability of missions as prerequisite to carrying on diplomatic functions and stressing States' duties to protect mission premises as required by international law), federal courts must defer to the language of Article 22. *Cf. Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 474 (2d Cir.1980) (recognizing U.S. obligations under Article 22 of the Vienna Convention), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981).

Hence, that portion of the district court's order awarding Sage Realty immediate possession of the premises and directing U.S. Marshals to remove the mission, its effects, and its personnel physically from the premises must be reversed.

### IV Contrary Holding Foreclosed

We recognize that there are negative policy implications from the ruling we propose. The undisputed economic burden of inviolability, for example, falls most heavily upon the private landlord, not on the government that urges inviolability of mission premises. Yet, an interest in fairness to the landlord does not justify creating a judicial gloss on the concept of mission inviolability

Particularly in recent years, attention has focused on an array of abuses of diplomatic privilege, *see, e.g.,* Higgins, *Abuse of Diplomatic Privileges, supra,* at 642–43 (noting diplomats and their families committing wide range of petty and more serious offenses in England), and a number of reforms to various diplomatic immunities have been suggested. *See* Shapiro, *Developments, supra,* at 281, 294–306. Nevertheless, reform of mission inviolability has not been undertaken, and the doctrine continues without exception to be the rule. *Cf.* Higgins, *Abuse of Diplomatic Privileges, supra,* at 646 ("[N]otwithstanding popular and ill-informed views to the contrary, the inviolability of premises is not lost by the perpetration from them of unlawful acts."). Reforming the Vienna Convention may well be a valid objective. But federal courts are an inappropriate forum to accomplish the amendment of a multilateral treaty to which the United States is a party. *See* Shapiro, *Developments, supra,* at 295 (judicial reform "would threaten a loss of consistency in the application of the Vienna Convention from country to country and could have dangerous international repercussions in the form of reciprocal action by other states").

Congress is of course the branch of government best suited to address the full array of concerns involved in altering the Vienna Convention. Already, the legislature has enacted the Diplomatic Relations Act of 1978, 22 U.S.C. §§ 254a–e (1988), to counter some of the more flagrant abuses of diplomatic privilege observed in this country. That Act gives the President the power "on the basis of reciprocity" to establish privileges and immunities for missions and their members "which result in more favorable or less favorable treatment than is provided under the Vienna Convention." *Id.* § 254c. Although the act requires liability insurance coverage for diplomatic missions and their representatives and families to insure against negligence arising from the operation of motor vehicles, vessels or aircraft, *id.* § 254e, it contains no restrictions on mission inviolability. While Congress and the President—via the Diplomatic Relations Act—possess the power to limit mission inviolability, neither has chosen to exercise that power. Our sister branches of government may more

appropriately initiate whatever revision, if any, of the Vienna Convention is deemed necessary. *Cf. Palestine Liberation Org.,* 695 F.Supp. at 1465 ("Congress *has the power* to enact statutes abrogating prior treaties or international obligations entered into by the United States").

This is not to say that Sage Realty is left wholly without a remedy for the mission's egregious, albeit explicable, shortcoming in rent payments. The Zairian Mission has not raised any challenge to the district court's authority to award monetary damages in favor of the landlord. Such judgment—even absent forcible eviction—is not without weight: to date, diplomatic efforts and pressure have proven extraordinarily successful at getting Zaire to pay the judgment for its back rent. The State Department has diligently pursued the matter on behalf of plaintiffs and went so far as to demand the expulsion of several Zairian diplomats if the judgment was not paid by a certain deadline.

A landlord in Sage Realty's position that desires to rent to a foreign mission may also be able to protect itself by requesting a waiver of inviolability in advance or by demanding additional security. The market rate for rent to such tenants might itself rise to incorporate risks posed by mission inviolability. In any event, the district court's worry that landlords in New York's rental market might shut out foreign missions because of their untouchable status appears overblown, especially since Sage Realty apparently continues negotiating for a new lease with the Zairian mission. If a sophisticated landlord like Sage Realty bears some risk in renting to a U.N. mission, it is not without notice of the diplomatic immunities with which it may later become entangled.

## CONCLUSION

Accordingly, the portion of the district court's order granting the landlord possession of the premises and ordering the U.S. Marshals forcibly to seize the premises, if necessary, is reversed. That portion of the

district court's order awarding plaintiffs monetary damages is affirmed.

Affirmed, in part, reversed, in part.