**767 THIRD AVENUE ASSOCIATES and Sage Realty Corporation, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–398L.

United States Court of Federal Claims.

Dec. 21, 1993.

Robert J. Ward, New York City, for plaintiffs.

Alan Brenner, Washington, DC, with whom was Deputy Chief James E. Brookshire, for defendant. Ann D. Navaro, Richard Lahne and Serena Moe, of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion for summary judgment and plaintiffs' cross-motion for partial summary judgment. For the reasons set forth below, the court grants defendant's motion and denies plaintiffs' partial cross-motion.

## FACTS

In February 1981, plaintiff, Sage Realty Corporation as agent for plaintiff, 767 Third Avenue Associates (Sage), entered into leases with the Consulate General of the Socialist Federal Republic of Yugoslavia (Consulate) and the Yugoslav Press and Cultural Center (Cultural Center). The leases were for the 17th and 18th floors, respectively, of the premises at 767 Third Avenue, New York City, New York. In March 1981 Sage entered into a lease with the Yugoslavia Chamber of Economy (Chamber of Economy) for a portion of the 24th floor of the same building. Each of the three leases was for a 10 year period ending in 1991, with two options to extend for five years each. A condition of extension required the lessees to notify Sage of the intent to extend eighteen months before termination of the original lease. In 1991, without giving the eighteen month notice, the Consulate and the Chamber of Economy informed Sage that they were going to retain their respective spaces until August 1996. Also in 1991, without the eighteen month notice, the Cultural Center told Sage it would retain the 18th floor until September 1994.

Early the following year the lessees failed to pay their rent and Sage notified the Cultural Center, the Chamber of Economy, and

the Consulate that their leases would be terminated if the defaults were not cured within five days. The defaults were not paid and Sage filed suit against all three lessees in the United States District Court for the Southern District of New York. That suit, entitled *767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*, No. 92–4946 (S.D.N.Y. filed July 2, 1992), sought the recovery of $120,792.48 as unpaid rent for two months each from the Consulate and the Chamber of Economy, and three months from the Cultural Center.

From before the expiration of the original leases the Socialist Federal Republic of Yugoslavia (SFRY) experienced significant turmoil, as did other countries of the former Soviet bloc, culminating in the bloody racial war extant today. The SFRY crumbled and on May 24, 1992, the United States formally acknowledged that the SFRY ceased to exist.[1] To underscore the United States' disapproval of the Belgrade regime's actions in Bosnia–Hercegovina, the State Department promptly downgraded the SFRY embassy and terminated the Consular post controlled by the regime. On May 25, 1992, the United States Department of State directed immediate closure of the Yugoslavia Consulate General in New York City and termination of its operations by the close of business May 31, 1992. Shortly thereafter, President George Bush issued two executive orders under the authority of the International Emergency Economic Powers Act, 50 U.S.C. § 1701 (1988 & Supp. III 1991), freezing Yugoslav assets in the United States and prohibiting all transactions, absent government approval, involving those assets. Thereafter, by letters dated May 27, 1992, and May 28, 1992, all three lessees terminated their leases with Sage. The termination notice from the Cultural Center assured Sage that "all amounts due under the lease would be paid by Yugoslav institutions still operating in the United States."

To implement the two Executive Orders, agents of the Department of the Treasury entered the premises on July 9, 1992, and posted a "Notice" on each floor which read, in relevant part:

> These premises have been closed by order of the United States Department of the Treasury.
>
> \* \* \* \* \* \*
>
> No access to these premises is permitted without specific authorization from the Office of Foreign Assets Control, U.S. Treasury Department
>
> For further information contact the Office of Foreign Asset Control at 202/622–2430.

Almost two months later, on August 28, 1992, Sage was informed that the restrictions were lifted on the 17th floor. On September 18 and 28, 1992, the Treasury Department, lifted, respectively, the restrictions on the 18th, and 24th floors.

Sage filed suit here pursuant to the just compensation clause of the Fifth Amendment of the Constitution for the loss of income (1) under the "extended" leases and (2) the period the United States restricted access to the leased space. In defendant's motion for summary judgment it argued that there had been no taking of property under either theory within the meaning of the Fifth Amendment. Sage cross-filed a motion for partial summary judgment for the monetary loss it allegedly suffered during the period access to the leased space was restricted by the Treasury Department.

## DISCUSSION

■ Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir. 1987). In considering a motion for summary judgment, the evidence must be viewed, and inferences drawn, in the light most favorable to the non-moving party. *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985).

---

1. On April 7, 1992, the United States formally recognized the independence of Bosnia–Hercegovina, Croatia, and Slovenia. The United States did not recognize Serbia and Montenegro as the continuation of the SFRY or the State of Yugoslavia.

■ The United States Court of Appeals for the Federal Circuit has indicated that in order to grant a motion for summary judgment in a takings case, there would need to be an extraordinary set of facts. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983). The question of whether a taking has occurred is frequently fact-intensive, requiring the development of a complete record through trial. *Id.* Despite the suggestion in *Yuba Goldfields,* the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action....'" *Tabb Lakes, Inc. v. United States,* 26 Cl.Ct. 1334, 1344 (1992) (*quoting Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)), *aff'd,* 10 F.3d 796 (Fed.Cir.1993), and there is no question that summary judgment is available and appropriate in just compensation cases. *Buffalo Nat'l Bank v. United States,* 26 Cl.Ct. 1436, 1440 (1992). If the moving party can support its argument that there are no genuine issues of material fact, the non-moving party "must present sufficient evidence to show an evidentiary conflict as to the material fact in dispute...." *Opryland USA, Inc. v. Great American Music Show, Inc.,* 970 F.2d 847, 850 (Fed.Cir.1992); *see also Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Otherwise, the movant is entitled to summary judgment. The "mere assertion that ... fact issues exist is insufficient to avoid summary judgment." *Levi Strauss & Co. v. Genesco Inc.,* 742 F.2d 1401, 1404 (Fed.Cir. 1984).

■ The Fifth Amendment prohibits the government from taking private property for public use without justly compensating the owner. It is not essential for the government to actually physically appropriate the property for its use for a taking to occur. A taking may also occur when the government by its actions deprives an owner of all or most of its compensable interest in the prop-erty. *A ris Gloves, Inc. v. United States,* 420 F.2d 1386, 1391 (Ct.Cl.1970); *Lucas v. South Carolina Coastal Council,* —— U.S. ——, —— – ——, 112 S.Ct. 2886, 2893–95, 120 L.Ed.2d 798 (1992). However, the Federal Circuit in *Preseault v. United States,* 27 Fed. Cl. 69 (1992), held that

> [i]t is well established that a takings claim cannot succeed under the Fifth Amendment if a government action, although causing economic harm, "[does] not interfere with interests that ... [are] sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes."

*Id.* at 84 (quoting *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

■ The question is whether the government must reimburse Sage for losses sustained through contracts breached by entities of the SFRY government allegedly attributable to sovereign acts taken by the United States' against the SFRY. "There is no question that '[v]alid contracts are property....'" *Chang v. United States,* 859 F.2d 893, 895 (Fed.Cir.1988) (quoting *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934)). However, governmental actions which interfere with existing contractual rights do not necessarily transform those actions into an illegal taking. *See Id.; Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 234–34, 106 S.Ct. 1018, 1030–31, 89 L.Ed.2d 166 (1986). While the Supreme Court has not provided a specific formula for deciding whether a taking has occurred, the Court has identified several factors that are of particular significance in determining what constitutes a taking. *See, e.g., Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). In *Connolly v. Pension Benefit Guaranty Corp.,* the Supreme Court iterated the factors which have particular significance in determining whether government actions impair contractual rights to such a degree that they constitute a compensable taking.[2] *Connolly,* 475 U.S. at 225, 106

2. The factors are (1) the extent to which the regulation interfered with investment-backed expectations; (2) the economic impact of the regu- lation on the claimant; and (3) the character of the governmental action.

S.Ct. at 1026 (citing *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659).

■ Sage and defendant differ as to the appropriate time to view Sage's investment-backed expectations. Sage, in its response to defendant's motion for summary judgement, argued that the appropriate time period in which to view its investment-backed expectations was 1981 when the original contracts were signed. Defendant argued that 1991, when the follow-on leases were executed, was the more appropriate time period to assess Sage's expectations. Sage argued that it was inappropriate to assess its expectations in 1991 because the right to the optional extensions vested in the lessees in 1981 when the original contracts were signed. However, at the time Sage initiated the follow-on leases each of the leases were well past the mandatory notice period; a condition precedent to the vested right to extend the original leases. The lease agreements required the lessees to give Sage notice of their election to extend the term of the lease at least eighteen months prior to the commencement of either additional five year extension. The leases further provided that if the lessees did not send extension notices as required by the lease agreement, their right to extend the term of the lease would have no further force or effect. *See, e.g.,* Lease between Sage Realty Corp. and Consulate General of the Socialist Federal Republic of Yugoslavia, Arts. 45.01 & 45.03. Because none of the lessees extended their lease agreements within the time provided under the 1981 lease agreements, the follow-on leases were accepted at Sage's option, not the lessees. Sage was under no obligation to consent to the follow-on leases as it would have been had the lessees exercised their contract rights to extend the original leases. Accordingly, the court finds that 1991 is the appropriate time to assess Sage's investment-backed expectations, though for all practicable purposes it makes no difference whether the expectations arose in 1991 or 1981.

■ At the time Sage first entered into the leases in 1981, and at the time of the follow-on leases in 1991, extensive statutory and constitutional authority existed that permitted sanctions against countries, including the closing of consular offices, and the freezing of assets. That authority must be considered in defining the total "bundle of rights" Sage possessed at the inception of the leases in 1981 and 1991. The broad powers of the President permitted the action taken against the SFRY. Article II, Section 3, of the Constitution confers on the President the exclusive power to "receive ambassadors and other public Ministers." In *Guaranty Trust Co. v. United States*, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938), the Supreme Court held that the act of the "political," or Executive Branch of government "in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts, which are bound to accept that determination...." *Id.* at 137–38, 58 S.Ct. at 791. The same authority allows the Executive to not recognize a foreign government, and to take sanctions when necessary.[3]

■ The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 (1988 & Supp. III 1991), was enacted to provide the President with sweeping authority to meet threats against national security and foreign policy. The IEEPA plainly authorizes the President to preserve foreign assets in the United States in a national emergency for a number of reasons. *Dames & Moore v. Regan*, 453 U.S. 654, 671–73, 101 S.Ct. 2972, 2982–83, 69 L.Ed.2d 918 (1981); *see also Regan v. Wald*, 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984). The actions of the government were taken under the authority of the IEEPA, which provides that the President may

> investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or

**3.** "[T]he ultimate decision as to how the United States should honor its treaty obligations with the international community is one which has, for at least one hundred years, been left to the executive to decide." *United States v. Palestine Liberation Org.,* 695 F.Supp. 1456, 1463 (S.D.N.Y.1988).

exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or national thereof has any interest.... 50 U.S.C. § 1702(a)(1)(B) (1988); *see also* United Nations Participation Act of 1945, 22 U.S.C. § 287c (1988); United Nations Security Council Resolution 757, May 30, 1992. There is no question but the United States possessed the authority to act against the SFRY as it did.

There was overwhelming public knowledge that relations between the United States and SFRY were strained to the breaking point and in imminent peril of breaking in 1991 when Sage executed the follow-on leases. The court cannot find any reasonable expectation that any contract entered into at that time with the SFRY would *not* be hindered by the intrusion of foreign affairs. *See Chang*, 859 F.2d at 897. When dealing in foreign commerce, the possibility of changing world circumstances and a corresponding response by the United States government can never be completely discounted. *Id.* (quoting *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106, 111–12 (2d Cir.), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966)). Sage may not now claim with any degree of credibility that the United States' sovereign acts against the SFRY, and the resulting impact on the follow-on leases was unforeseeable at the time Sage entered into them. Even if the court were to assess Sage's investment-backed expectations when the original contracts were signed in 1981, the law would produce the same result. In *Chang v. United States*, the Federal Circuit held that those who enter into contracts with foreign entities "do so in light of one salient fact of economic life: that their ability to perform and compel performance is contingent upon the continuation of friendly relations between nations." *Chang*, 859 F.2d at 897. The record clearly reflects that Sage was on notice of the risks that attend leasing to international tenants in 1981 as well as 1991. The IEEPA was enacted in 1977, and case law excluding the courts from interfering with the constitutional authority of the President to conduct our nation's foreign affairs predated the leases by a century. *Guaranty Trust Co.*, 304 U.S.

at 138, 58 S.Ct. at 791; *United States v. Palestine Liberation Org.*, 695 F.Supp. 1456, 1463 (S.D.N.Y.1988).

That Sage was a knowledgeable leasing agent to missions to the United Nations is witnessed by the fact that it leased other space in the same building to other consular and mission offices. *See, e.g., 767 Third Ave. Assocs. v. Permanent Mission of the Republic of Zaire to United Nations*, 988 F.2d 295 (2d Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 74, 126 L.Ed.2d 42 (1993). Sage's dispute with Zaire was the same as that with the SFRY; a foreign mission tenant refused to make timely lease payments to Sage. In the case of the Zairian Mission, Sage filed suit in the United States District Court for the Southern District of New York to gain possession of the leased space, forcible eviction of the mission if it failed to leave voluntarily, and damages in the amount of lost rent payments. The District Court ruled in favor of Sage and Zaire appealed. In affirming and reversing in part the Court of Appeals for the Second Circuit made several comments that are germane to the case before the court today. That court held that the premises leased from Sage were inviolable under international and United States law and that any changes in the law would have to come from one of the other branches of our government; not by judicial interpretation of clear provisions of treaties and law. *767 Third Ave. Assocs.*, 988 F.2d at 302–03. The court recognized that the landlord in these circumstances bears the economic burden of inviolability but that there are other available remedies such as requiring additional security from foreign government missions, or a waiver of inviolability. *Id.* at 303. The court concluded that "[i]f a sophisticated landlord like Sage Realty bears some risk in renting to a U.N. mission, it is not without notice of the diplomatic immunities with which it may later become entangled." *Id.* The latter comment in *Zaire* is telling in this case because Sage argued here that it was unsophisticated in terms of the laws surrounding international missions to the U.N. and could not be expected to know that its "bundle of rights" might be affected by international events. The court finds Sage's

claims unbelievable and deleterious to its arguments. Sage was clearly sophisticated in this area; knowledge of events occurring in the former SFRY in 1991 was not limited to diplomats and other foreign affairs experts, and the same risks were present in 1981.

Even the contracts Sage used to bind the lessees indicated Sage was aware of the difficulties which arise from leasing to international tenants. Each lease provided Sage with protection as to rental payments due to their inability to perform because of governmental pre-emption, rule, order or regulation. *See, e.g.,* Lease between Sage Realty Corp. and Consulate General of the Socialist Federal Republic of Yugoslavia, Art. 34. The simple fact is that Sage leased office space to the SFRY agencies at a risk. The risk was that some event would obligate the United States to take commonly accepted political action against the SFRY, such as by closing its consular offices and freezing its assets and property. As a result, Sage may not be heard to claim that they had an investment-backed expectation to be free from government interference with their contract rights in either 1981 or 1991. What was missing from Sage's bundle of property rights was the right to be protected from financial loss that might follow eviction of its lessees from the country by the federal government. It is for that loss that Sage brought suit here. The court finds that Sage had no compensable investment-backed expectations.

After the government released the subject premises, Sage was free to lease the premises to any other tenant. The government's actions merely deprived Sage of its opportunity to continue to lease the space to the three specific lessees. As a result, the government's actions do not result in a taking of Sage's ability to lease their property, but merely a frustration of Sage's expectations of future profit from specific lessees. The Supreme Court has made it clear that a taking does not occur solely from government action which might prohibit the highest use of property. See *Penn Central,* 438 U.S. at 125, 98 S.Ct. at 2659. Because Sage is free to lease its space to any other tenant, any loss of future profits it may encounter is the result of forces within the marketplace, not the government's actions in the present case.

In its cross-motion for partial summary judgment, Sage argued that the taking of the leases was a regulatory taking and the taking of the space by "closing" the premises was a "per se" temporary taking, and that the elements for testing for the existence of either differ. The court does not agree that there were two "forms" of a taking.

■■■■ Sage claimed a separate physical, or "per se," taking of the subject property from July 9, 1992, the date the Treasury Department "Notices" were placed on the premises, until the government released the space to Sage in August and September of 1992. In most instances a temporary physical taking requires compensation under the Fifth Amendment. *See, e.g., United States v. General Motors Corp.,* 323 U.S. 373, 380, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945). However, such is not the case here. Defendant did not take physical possession of the subject premises and Sage was never physically denied access to the property on those occasions when it asked for access. Sage might have been given permission to re-lease the property, but it never asked.

Sage argued strongly that it had no viable alternative to recovery except from the United States, but even if that were the case the government cannot be held liable, even jointly liable with the SFRY, or its successors in interest. The court has found that the government was well within its rights in ordering the SFRY agencies closed, and that temporarily restricting access to the premises pending arrangements to protect property belonging to the SFRY flowed directly from the closure order. The seizure was not a separate taking that must be adjudicated under a different theory of law but is disposed of with the court's findings that the closure was proper and not a compensable taking. To separate the two "events" would require the court to be blind to the facts.

## CONCLUSION

■■■■ Contrary to its carefully crafted arguments Sage never possessed certain elements of property rights in its leases with the SFRY. Missing was the general assurance that the government would not interfere in its private contracts with foreign entities.

When the United States expelled the SFRY agencies and temporarily restricted access to the premises under the authority of the Constitution and the IEEPA it acted fully within its sovereign rights to conduct foreign affairs and took no property interests owned by Sage for which Sage would be entitled to just compensation. The President and Secretary of the Treasury acted in the interests of the United States as required by law and while it is regrettable that Sage was damaged financially as a result of expelling the agencies that is the risk it assumed when it contracted with the SFRY in 1991 without taking steps to protect itself should the foreseeable occur. The United States has attempted to assist Sage in recovering the lost rents from the former SFRY, and the possibility still exists that funds will be found either within or without the United States to make Sage whole. Nevertheless, the United States is not an insurer of lease payments by foreign missions to the United Nations to landlords who fail to take steps to protect themselves. *See Belk v. United States*, 12 Cl.Ct. 732, 734–35 (1987), *aff'd*, 858 F.2d 706 (Fed.Cir.1988).

For the reasons stated above, the court grants defendant's motion for summary judgement, and denies Sage's cross-motion for partial summary judgment. The Clerk of the Court is directed to dismiss the complaint.

**IT IS SO ORDERED.**