**ROCKEFELLER CENTER
PROPERTIES,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 92–635C.

United States Court of Federal Claims.

Jan. 25, 1995.

David M. Rubin, New York City, Attorney of record, for plaintiff.

Jonathan P. Welch, Washington, DC, with whom was Asst. Atty. Gen., Frank W. Hunger, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

### INTRODUCTION

This takings case arose against the backdrop of foreign relations of the United States with the former government of Yugoslavia. Plaintiff, a lessor of commercial real estate in New York City, had leased commercial and office space to certain agencies of the Yugoslavian government. When the former Yugoslavia began to disintegrate and relations between the United States and Yugoslavia (specifically Serbia) became strained, President Bush issued two executive orders freezing all property in the United States in which the Yugoslavian government had an interest and forbidding transactions related to such property. Plaintiff contends that, as a result of this governmental action, the United States effected a compensable taking of its property. Specifically, plaintiff alleges that it was denied its property rights under its lease with the Yugoslavian government.

Currently, this case is before the court on Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment. Because we can find no dispute concerning any genuine issue of material fact, the court concludes that this case may be appropriately decided on summary judgment motions. Moreover, after examining the applicable legal standards and the record before the court, we further find that the United States is entitled to summary judgment as a matter of law. Therefore, defendant's motion for summary judgment is granted, and plaintiff's cross-motion is denied.

### FACTS [1]

On July 17 and 18, 1975, Rockefeller Center, Inc., plaintiff's predecessor, and Jugoslovenski Aerotransport (Yugoslav Airlines or

---

1. The facts presented below are culled from the parties' Joint Stipulation of Uncontroverted Facts, filed November 8, 1993, unless otherwise indicated.

JAT) entered into a lease[2] by which JAT occupied certain commercial and office space in Rockefeller Center, New York City. The lease was to run until 1994, and, under the terms thereof, JAT, a governmental entity of Yugoslavia,[3] agreed to waive its sovereign immunity, consenting to suit in the event of a default on rent payment. Under several supplemental agreements, JAT sublet portions of the leased premises to various other agencies of the Yugoslavian government.

In 1982, Rockefeller Center Properties (RCP) was formed as a partnership and as successor to Rockefeller Center, Inc. Throughout the term of the lease, JAT was, from time to time, late in paying its rent. For example, JAT's rent for the months of October, November, and December of 1991 and January of 1992, in the total amount of $96,000, was not paid until January 30, 1992. On January 28, 1992, RCP and JAT entered into a supplemental indenture extending the term of the lease one year to 1995. Along with the extension, JAT executed an irrevocable letter of credit in the amount of $165,-586.39 to be drawn upon by RCP at the Beogradska Banka (the Bank) in the event of a default by JAT on rent payment.

Several months later, on May 30, 1992, President Bush issued Executive Order No. 12,808 blocking all assets and property interests of the governments of Serbia, Montenegro, and the Federal Republic of Yugoslavia (collectively the FRY)[4] in the United States. 57 Fed.Reg. 23,299 (1992). Another Executive Order, No. 12,810, followed soon thereafter on June 5, 1992, forbidding United States persons from engaging in transactions involving FRY property interests. 57 Fed.Reg. 24,347 (1992). On that same day, the Trea-

sury Department's Office of Foreign Asset Control (OFAC) listed JAT and the Bank as blocked entities. OFAC had posted notices on the leased premises several days earlier, on June 1, 1992. The notices stated that said premises had been closed and that any property on the premises in which the FRY had an interest was blocked.

Pursuant to these executive orders, OFAC was authorized to issue licenses permitting the licensee to engage in otherwise prohibited activities. On June 22, 1992, OFAC issued License Y–0012 to JAT allowing it access to the leased premises and permitting it to pay its office expenses, including rent, from a "Demand Deposit Account."[5] By this time, JAT was delinquent in paying its rent for the month of June, and, on June 26, 1992, RCP attempted to draw upon the letter of credit. The Bank informed RCP that it could not pay because the account was blocked. Consequently, on July 21, 1992, RCP requested permission from OFAC to commence an action against JAT to regain possession of the leased premises and to draw on the letter of credit.

Five months later, on December 21, 1992, OFAC issued License Y–0236 authorizing RCP to bring suit against JAT. An accompanying letter informed RCP that it was not authorized to draw upon the letter of credit "at this time." As a result, RCP initiated an eviction proceeding against JAT. Pursuant to a subsequent settlement agreement, RCP regained possession of the premises on February 23, 1993.

Suit in this court was filed on September 11, 1992. By its complaint, plaintiff seeks damages pursuant to the Fifth Amendment of the United States Constitution for an un-

2. What is collectively referred to herein as "the lease" is actually composed of several lease agreements governing separate commercial and office spaces in Rockefeller Center, as well as subleases thereof to other agencies of the Yugoslavian government. A copy of the lease is affixed as Exhibit A to the Affidavit of Cheryl L. Davis, filed June 2, 1993 (hereinafter cited as "Lease").

3. As used herein, Yugoslavia refers to the Socialist Federal Republic of Yugoslavia (SFRY). On May 24, 1992, the United States formally recognized that the SFRY ceased to exist.

4. The FRY, the "successor" government to the SFRY, was not recognized by the United States.

5. By the terms of License Y–0012, JAT was authorized to maintain a "Linked Account," to receive payments of accounts receivable as well as "fresh funds" from foreign sources, and a "Demand Deposit Account," from which authorized payments of business expenses were to be made. The Linked Account could be debited to provide funds for the Demand Deposit Account, provided that the amount of the transfer did not exceed $815,014.24. (Jt.Stip. ¶ 11).

compensated taking of private property. As its measure of damages, RCP contends that it is entitled to compensation for the rent that was never paid by JAT from June 1, 1992, until it regained possession on February 23, 1993, and for the face value of the letter of credit upon which it was prevented from drawing.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

### I. CONTENTIONS OF THE PARTIES

#### A. *PLAINTIFF*

RCP alleges that, by the blocking order contained in Executive Orders Nos. 12,808 and 12,810, the federal government prevented it from exercising its right to evict JAT for failure to pay rent. As a result, plaintiff maintains, JAT was able to remain in possession of the premises without paying rent. RCP contends that this denial of its right to evict amounted to a compensable taking under the Fifth Amendment. The fact that this alleged taking was temporary, avers plaintiff, is of no consequence in determining whether a taking is compensable. Additionally, plaintiff argues that JAT's waiver of sovereign immunity contained in the lease confirms that it had a reasonable investment-backed expectation that it would be able to initiate an eviction proceeding against JAT. Furthermore, RCP asserts that by blocking the accounts of the Bank, thereby preventing it from drawing on its security interest, defendant effected a taking of its letter of credit. Accordingly, RCP submits that, on the undisputed facts, it is entitled to summary judgment solely on liability as a matter of law.

#### B. *DEFENDANT*

The United States contends that the temporary blocking of plaintiff's ability to proceed against JAT for eviction did not deny RCP its interest as lessor in the lease. In support of this contention, defendant alleges that, pursuant to License Y–0012, JAT was authorized to pay rent to RCP. Therefore, defendant concludes, RCP was not denied its rights under the lease by the actions of the federal government. Moreover, the United States asserts that, in order to determine whether a compensable taking has occurred, one must examine the character of the governmental action, the extent of interference with investment-backed expectations, and the economic impact on the plaintiff. Using this framework, defendant argues that its actions did not effect a permanent physical appropriation of RCP's property but, rather, that the blocking of FRY property interests was a beneficial act of foreign policy designed to secure the commercial interest of United States citizens with claims against the FRY. Defendant further contends that RCP did not have any reasonable investment-backed expectations that were upset by the actions of the government. In this connection, defendant observes that dealings with foreign governments are always contingent upon good relations between the United States and the foreign country dealt with and that economic sanctions are always a possibility against a foreign government. Furthermore, defendant maintains that plaintiff chose to deal with the Yugoslavian government during a time of strained relations with the United States. Finally, defendant alleges that RCP's letter of credit may still be honored by the Bank. For these reasons, the United States concludes that it is entitled to summary judgment.[6]

### II. DISCUSSION

#### A. *INTRODUCTION*

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. RCFC 56. When considering a motion for summary judgment, the evidence and all factual inferences must be

---

**6.** The United States has also moved for dismissal for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4). However, Rule 12(b) provides that a motion to dismiss for failure to state a claim may be treated as a motion for summary judgment under RCFC 56 if matters outside the pleadings are presented to the court. Because the parties have presented matters outside the complaint, and mindful of the Federal Circuit's admonishment that takings cases are "fact-intensive," *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir. 1983), we shall treat defendant's motion as solely one for summary judgment.

viewed in the light most favorable to the non-moving party. *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985). The moving party bears the burden of showing that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be discharged by "pointing out ... that there is an absence of evidence to support the non-moving party's case." *Sweats Fashion, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). If the movant succeeds in carrying its burden, the non-movant must then demonstrate, by appropriate evidence, the existence of a genuine issue of material fact. *Beauchamp Constr. Co., Inc.*, 14 Cl.Ct. 430, 435 (1988). Mindful of these considerations, we now address the parties' cross-motions for summary judgment.

■ The first step in considering a motion for summary judgment is to ascertain whether any genuine issues of material fact are present. In order to evaluate whether a factual dispute is material, one must look to the legal standards applicable to the subject of the suit. Only legally significant facts, *i.e.*, those that would change the outcome of the litigation, are deemed material. If it is determined that no genuine material issues are present, the court is then in a position to decide whether the moving party is entitled to judgment as a matter of law. Because we can find no genuine issues of material fact, we conclude that, based on the applicable precedent, defendant is entitled to judgment as a matter of law on this record.

### B. *ANALYSIS*

#### 1. *Legal Standards*

■ The Takings Clause of the Fifth Amendment[7] prohibits the taking of private property for public use without just compensation. U.S. Const.Amend. V. Generally, the applicable precedent recognizes two types of compensable takings. *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1071–72 (Fed.Cir.1994). First, government action which effects a physical invasion of private property or which amounts to a permanent occupation thereof arises to a taking under the Constitution. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that the physical occupation caused by the mandatory installation of cable television equipment was a compensable taking). This type of regulatory action is "compensable without case-specific inquiry into the public interest advanced in support of the restraint ... no matter how minute the intrusion." *Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992).[8]

■ A second type of taking, sometimes called "regulatory" or "non-possessory," occurs when a regulation goes too far and impinges on private freedom. *Golden Pac.*, 15 F.3d at 1072. In this context, the Supreme Court has made clear that there is no "set formula" for determining when a governmental action or regulation goes too far and effects a compensable taking. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Rather, the courts have consistently held that such a determination turns on "a case-by-case factual analysis of the particular circumstances presented." *Chang v. United States*, 859 F.2d 893, 895 (Fed.Cir. 1988) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984)). As a result, takings cases are often observed to be "fact-intensive." *Yuba Goldfields*, 723 F.2d at 887; *767 Third Ave. Assoc. v. United States*, 30 Fed. Cl. 216, 219 (1993).[9]

■ In this case, plaintiff argues that by denying it its rights under the lease with

---

7. The Fifth Amendment states in pertinent part: "[N]or shall private property be taken for public use, without just compensation."

8. In *Lucas*, the Court held that, when a land use regulation deprives a landowner of all economically beneficial use of his property, a compensable taking has occurred.

9. While takings cases are frequently fact-intensive, "there is no question that summary judgment is available and appropriate in just compensation cases" when the Rule 56 standards have been met. *767 Third Ave.*, 30 Fed.Cl. at 219 (citing *Buffalo Nat'l Bank v. United States*, 26 Cl.Ct. 1436, 1440 (1992)).

JAT, specifically to evict the delinquent tenant and to draw upon the letter of credit, the government took private property without compensation.[10] It is well-settled that valid contracts constitute private property for the purposes of the Fifth Amendment. *Chang,* 859 F.2d at 895; *767 Third Ave.,* 30 Fed.Cl. at 219. However, governmental actions which interfere with existing contractual rights do not necessarily effect compensable takings. *Id.* In making the necessary ad hoc factual determinations required to ascertain whether a taking has occurred, the Supreme Court has suggested that three factors are of particular significance. *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986); *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. In *Connolly,* the Court identified the following particularly significant factors:

> (1) the economic impact of the regulation on claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.

475 U.S. at 225, 106 S.Ct. at 1026 (internal quotation marks omitted) (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659). *See also, Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir.1994) ("When presented with a regulatory taking claim this court analyzes [these] three separate criteria...."). Accordingly, we now turn to examine the facts of the case at bar in light of these three factors, taking them in reverse order.

### 2. *Application*

#### a. *Character of the Governmental Action*

■ First we note that the governmental action at issue here was neither a physical invasion nor a permanent occupation of plaintiff's property. Rather, the blocking order merely interfered with plaintiff's contract rights under the lease with JAT and the letter of credit. When governmental action is of a non-physical, non-possessory character, it is relevant whether "the interference with property rights ... arises from a public program that adjusts the benefits and burdens of economic life to promote the public good." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026. The Supreme Court has often held that, in such cases, the challenged interference does not constitute a taking requiring government compensation. *E.g., Id.* See *also, Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979). The extent to which the claimant is an incidental beneficiary of the governmental action and the importance of the public interest to be served are both considerations to be taken into account pursuant to this analysis. *See Shanghai Power Co. v. United States,* 4 Cl. Ct. 237, 242–43 (1983). Essentially,

> [t]he first criterion require[s] that [the] court consider the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court [is] to balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint.

*Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1176 (Fed.Cir.1994).

■ The blocking of FRY property in this case was undertaken pursuant to the International Emergency Economic Powers Act (IEEPA). 50 U.S.C. § 1701 *et seq.* (1988 & Supp. V.1993). That Act gives the President the authority "to deal with any unusual and extraordinary threat ... to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Clearly, the public interest to be served by this scheme and actions taken pursuant to it are of paramount importance. The President's ability to deal effectively with international events is critical to the safety and prosperity of the nation. Furthermore, the blocking of a for-

---

10. Although it is unclear, plaintiff seems to possibly be arguing at times that the government effected a physical taking of the leased premises by denying RCP access to the premises. This argument is unpersuasive. First, the United States never occupied the premises. Second, RCP as lessor did not generally have the right to occupy the premises, that right having been conveyed to the lessee by way of the lease. RCP did have a right under the lease to regain possession of the premises in the event of a default on rent payments, and it is this right that RCP was attempting to exercise by bringing an eviction suit. (Lease art. 16). It is this contractual right that we treat as the property allegedly taken by the United States.

eign government's property can serve to preserve assets as compensation for the claims of United States nationals. (Affidavit of R. Richard Newcomb, Director, OFAC, Def. Br.App. at 2–3). Thus, any United States creditor is a potential beneficiary of the President's authority to block foreign property. *Cf. Shanghai Power*, 4 Cl.Ct. at 243–44 ("The possibility that the President will intervene in this manner is properly recognized as both a shared benefit and a shared risk of those who trade . . . abroad.").

There are no factual disputes regarding the events which constituted the governmental action at issue in the instant case, although the parties may disagree on the legal interpretation of those facts. The government did not physically invade or appropriate RCP's property, but rather implemented non-possessory regulations which hindered plaintiff's contract rights. Because of the importance of the public interest served by presidential action in international affairs and crises, as well as the potential benefit to creditors such as RCP from a blocking order, we find that this factor militates in favor of a finding that no taking occurred.

### b. *Interference with Investment–Backed Expectations*

Secondly, governmental action that interferes with contract rights will rise to the level of a compensable taking only to the extent that it interferes with "reasonable investment-backed expectations." *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026; *Golden Pac.*, 15 F.3d at 1074. Indeed, "the force of this factor may be so overwhelming . . . that it disposes of the taking question. . . ." *Golden Pac.*, 15 F.3d at 1074 (quoting *Monsanto*, 467 U.S. at 1005, 104 S.Ct. at 2874).

In the case at bar, RCP voluntarily chose to deal with JAT, an agency of a foreign government. The Federal Circuit has held that those who deal contractually with foreign entities "do so in light of one salient fact of economic life: that their ability to perform and compel performance is contingent upon the continuation of friendly relations between nations." *Chang*, 859 F.2d at 897. *See also, 767 Third Ave.*, 30 Fed.Cl. at 221. In *767 Third Ave.*, 30 Fed.Cl. at 221, the Court of Federal Claims applied this principle to facts very similar to those presented in this case. In that case, plaintiff was a lessor of office space to certain agencies of the Yugoslavian government. *Id.* at 217. The lessor, like the plaintiff at bar, brought suit for an alleged taking caused by the presidential orders blocking Yugoslavian property in the United States. *Id.* at 218. The court noted that, when dealing commercially with an agency of a foreign government, "the possibility of changing world circumstances and a corresponding response by the United States government can never be completely discounted." *Id.* at 221. Because the court found that the lessor had notice of the risks of leasing to a foreign government, it concluded that the presidential action blocking Yugoslavian property did not interfere with any reasonable investment-backed expectations on the part of the lessor. *Id.* Based on all of the foregoing, we are constrained to reach the same conclusion.

Congress is explicitly granted "the power to regulate commerce with foreign nations" in the Constitution. U.S. Const. Art. I, § 8, cl. 3. Pursuant to its unquestioned constitutional power, Congress has duly delegated sweeping authority to the President in the IEEPA to "nullify, void, prevent or prohibit . . . any right, power or privilege in any property in which any foreign country . . . has any interest." 50 U.S.C. § 1702(a)(1)(B). Thus, contracts entered into with foreign governments are "in every sense subordinate to the President's power under the IEEPA." *Chang*, 859 F.2d at 897. *Cf. Connolly*, 475 U.S. at 224, 106 S.Ct. at 1025–26 ("Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them."). Stated differently, those who trade with foreign governments must, therefore, take the President's power into account in structuring their transactions. *Shanghai Power*, 4 Cl.Ct. at 247. The IEEPA was enacted in 1977, many years prior to the execution of the lease extension and the letter of credit in favor of RCP. Against this background, RCP could have, and should have, accounted for the possibility that the President would exercise his authority at an appropriate time.

While the original lease was entered into in 1975, prior to the IEEPA, the President possessed very similar authority under the Trading with the Enemy Act (TWEA) at that time, although the procedures and circumstances for its exercise were different. 50 U.S.C.App. §§ 1–44 (1988 & Supp. V. 1993); *Regan v. Wald*, 468 U.S. 222, 228, 104 S.Ct. 3026, 3030–31, 82 L.Ed.2d 171 (1984) (citing 50 U.S.C.App. 5(b)). Prior to the enactment of the IEEPA, the TWEA gave the President broad authority to deal with both peacetime emergencies and times of war. *Regan*, 468 U.S. at 225–26, 104 S.Ct. at 3029–30. In 1977, the President's peacetime emergency powers were essentially transferred from the TWEA to the IEEPA. *Id.* at 227–28, 104 S.Ct. at 3030–31. At least in part, the IEEPA was a response to what was perceived as too sweeping a grant of authority given to the President pursuant to the TWEA. Barry E. Carter, *International Economic Sanctions: Improving the Haphazard U.S. Legal Regime*, 75 Cal.L.Rev. 1159, 1229–32 (1987). Therefore, RCP had definite cause to know that the President had authority, such as that exercised in this case, that he might use.

Furthermore, the United States had blocked the property of foreign governments within its territory previous to the lease between RCP and JAT. For example, in 1963, the United States implemented the Cuban Assets Control Regulations, 31 C.F.R. Part 515 (1963), which, like the blocking order at issue here, prohibited all "transactions involv[ing] property in which [Cuba], or any national thereof has ... any interest." 31 C.F.R. § 515.201(b) (1994). *See Regan*, 468 U.S. at 225–27, 104 S.Ct. at 3029–30; *Alfred Dunhill, Inc. v. Cuba*, 425 U.S. 682, 735–36, n. 25, 96 S.Ct. 1854, 1882 n. 25, 48 L.Ed.2d 301 (1976) (Marshall, J., dissenting). By July 1975, when RCP entered into the lease with JAT, similar restrictions had been imposed on North Korea, Cambodia, North Vietnam, and South Vietnam. 31 C.F.R. § 500.201 (1994). Thus, as early as in 1975, RCP reasonably could have, and should have, recognized the possibility that relations between the United States and Yugoslavia could deteriorate and that the President might act to block Yugoslavian property interests within the country.

Based on the undisputed facts, in both 1975 and 1992, when the original lease and the letter of credit were entered into respectively, RCP had notice that commercial dealings with foreign entities were contingent on continuing friendly relations, that changes in the global situation were always a possibility, and that the President, as well as Congress, had broad powers to deal with international crises by interfering with commerce between United States persons and foreign governmental entities. Therefore, we must conclude that RCP was on notice of the risks attendant to leasing commercial real estate to foreign governments, and that, accordingly, RCP did not have *reasonable* investment-backed expectations interfered with when President Bush issued executive orders blocking FRY property.

Moreover, by 1992, when the lease extension and letter of credit were executed, there was widespread public knowledge of the strained and deteriorating relationships between the United States and Yugoslavia as well as within Yugoslavia itself. *See 767 Third Ave.*, 30 Fed.Cl. at 221. Defendant cites to numerous newspaper accounts of the events transpiring at that time. These indicate that, in 1991, the United States denounced Serbian aggression and criticized the violence in Yugoslavia, that the United States in connection with the United Nations imposed an arms embargo on Yugoslavia, and that Serbia–Montenegro took over Yugoslav federal institutions but was not accepted by the United States as speaking for Yugoslavia. Plaintiff, RCP, does not dispute these facts but merely argues that during these events the United States was resisting the break up of Yugoslavia. However, this only confirms that, during that time, the break up of Yugoslavia was seen as an imminent possibility. Therefore, because of the widespread public knowledge of the strained and deteriorating relationship with Yugoslavia that existed in the United States prior to 1992, RCP could not have had any reasonable investment-backed expectation that its ability to draw on the letter of credit would not be interfered with by foreign affairs authorities. With respect to the letter of credit, we find

that this factor alone is dispositive.[11] Notwithstanding the preceding discussion of international events in the early 1990s, analysis of this second factor strongly suggests that plaintiff did not suffer a compensable taking.

### c. *Severity of the Economic Impact*

Finally, we must consider the economic impact of the challenged action on RCP in order to determine whether or not a compensable taking has occurred. The blocking of FRY property interests in the United States prevented RCP from evicting its tenant, JAT, for non-payment of rent for approximately five months (from June 21 to December 21, 1992) out of a 20–year lease. In assessing economic impact in land-taking cases, courts will often calculate the percentage of diminution in value occasioned by governmental action. *E.g. Bowles v. United States*, 31 Fed.Cl. 37, 48 (1994) (91.8% diminution was a taking); *Ciampitti v. United States*, 22 Cl.Ct. 310, 320, n. 5 (1991) (no taking when 25% diminution); *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153, 160 (1990) (taking when 99% diminution). Applying an analogous method to the facts at bar, JAT had possession of the premises from September 1, 1975, to February 23, 1993 (approximately 210 months). RCP alleges that it has lost rent for at most nine of those months due to the blocking order (from June 1, 1992 to February 23, 1993). Thus, plaintiff allegedly lost rent for roughly 4.3% of the total time in which JAT occupied the premises. Once plaintiff regained possession, it was able to seek a new lessee for the premises and to thereby gain an economic benefit from its property. Based on the foregoing, we conclude that the economic impact of the blocking order on RCP's lease rights to evict JAT was not particularly severe, and, in fact, *de minimis* at best.

In sum, an analysis of the factors deemed by the Supreme Court to be significant in ascertaining whether or not a taking has occurred reveals that, in this case, no compensable taking was effected when the OFAC, pursuant to Executive Orders 12,808 and 12,810, denied RCP its contract rights to evict JAT and to draw upon the letter of credit. Particularly salient is the lack of reasonable investment-backed expectations on the part of RCP. The parties do not disagree about the essential facts surrounding the events that occurred in this affair. Thus, there are no genuine issues of material fact present. Accordingly, this matter is appropriately presented for summary judgment. Based on the applicable precedent, we hold that defendant is entitled to judgment as a matter of law.

### CONCLUSION

Because there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law, defendant's motion for summary judgment is hereby GRANTED. Conversely, plaintiff's cross-motion for summary judgment is hereby DENIED. The Clerk shall enter judgment accordingly and dismiss subject complaint. Costs to the defendant against plaintiff.

IT IS SO ORDERED.

---

11. With respect to RCP's reasonable investment-backed expectations in the letter of credit, "the force of this factor [is] so overwhelming ... that it disposes of the taking question...." *Monsan-to*, 467 U.S. at 1005, 104 S.Ct. at 2874. Accordingly, we need not and do not consider the economic impact of the challenged governmental action on the letter of credit.