**Chris PARADISSIOTIS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–354C.

United States Court of Federal Claims.

March 27, 2001.

Edwin Armistead Easterby, Houston, TX, attorney of record for plaintiff.

Jeffrey A. Belkin, Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant. David M. Cohen, Director, and Mark A. Melnick, Assistant Director.

## OPINION

FUTEY, Judge.

This takings case is before the court on defendant's motion to dismiss for failure to state a claim upon which relief may be granted, and plaintiff's opposition thereto, or, in the alternative, for leave to amend his complaint. Plaintiff Chris Paradissiotis, a Cypriot citizen with business ties to the government of Libya, has brought a claim for just compensation pursuant to the Takings Clause of the Fifth Amendment, stemming from an alleged governmental regulatory taking of certain securities that he owned. Acting pursuant to applicable law, the Office of Foreign Asset Control (OFAC), on behalf of the government of the United States (defendant), prohibited plaintiff from exercising certain stock options in a U.S. company. The options subsequently expired while still blocked by OFAC. Defendant argues that plaintiff cannot show a compensable taking, because the prohibition of the exercise of the options was backed by overwhelming national security interests, and because plaintiff had no reasonable expectation that he would be allowed to exercise his options due to strained relations between the United States and Libya. Plaintiff states that he could not have possibly been able to foresee the string of occurrences that led to the blocking of his stock options, and that the preservation of national security did not rely upon the de-

struction of those options. If the court finds that defendant's motion to dismiss should be granted, plaintiff asks that he be able to amend his complaint to remedy any deficiencies.

### Factual Background

Pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1706 (1994 & Supp. II 1996) (IEEPA), the president may order sanctions against nations that endanger national security and interests. In early January 1986, President Reagan issued two executive orders "to deal with the threat to the national security and foreign policy of the United States" posed by Libya. Exec. Order No. 12,543, 51 Fed.Reg. 875 (Jan. 7, 1986); Exec. Order No. 12,544, 51 Fed.Reg. 1235 (Jan. 8, 1986). Later that month, OFAC promulgated the Libyan Sanction Regulations (LSRs), codified at 31 C.F.R. pt. 550 (2000), in accordance with the executive orders. The LSRs mandated the freezing or blocking of all assets categorized as owned or controlled by the government of Libya. All so-called "U.S. persons," the definition of which includes corporations organized in this country, see 31 C.F.R. § 550.308, were immediately prohibited from business dealings with the government of Libya.

The LSRs state,

The term *Government of Libya* includes:

(a) The state and the Government of Libya, as well as any political subdivision, agency, or instrumentality thereof, including the Central Bank of Libya;

(b) Any partnership, association, corporation, or other organization owned or controlled directly or indirectly by the foregoing;

(c) Any person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing;

(d) Any other person or organization determined by the Secretary of the Treasury to be included within this section.

31 C.F.R. § 550.304. Persons falling under the scope of this section are referred to as Specially Designated Nationals (SDNs). SDNs or U.S. persons wishing to do business regulated by the LSRs must apply to OFAC for a license to do so. OFAC will make the determination and allow licenses when it is proper pursuant to the LSRs.

Plaintiff is a citizen and resident of Cyprus.[1] For at least 17 years, plaintiff has been an employee or official in some capacity for, or has been otherwise involved with, either Coastal Corporation (Coastal), a Delaware corporation, or its subsidiaries. In 1985, plaintiff received options to buy 2,250 shares of Coastal stock at $20.91. In 1986, plaintiff became a director of Holborn Oil Trading, Ltd. (HOTL), a Bermuda corporation owned by Coastal. HOTL controls an oil refinery on behalf of Libya in Germany. HOTL, in turn, owns one-third of the stock of Holborn Investment Company, Ltd. (HICL), a Cyprus corporation involved in maintaining and operating the aforementioned refinery. The majority owner of HICL is Oilinvest International N.V. (Oilinvest), which was owned by the government of Libya from 1990 to 1993. Pursuant to its contractual right, HOTL installed plaintiff as a director on the board of HICL, at the time the government of Libya had majority interest in HICL. By April 1991, the board of HICL had three Libyan members in its five-member board. These Libyan directors served contemporaneously as managers of Libyan-controlled Oilinvest. Thus, by 1990, (1) the government of Libya controlled HICL, for which plaintiff served as a director, and (2) plaintiff was president and a director of HOTL, which owned an oil refinery for the benefit of Libya. *Paradissiotis v. Rubin,* 171 F.3d 983 (5th Cir.1999) (*Paradissiotis II* ).

Coastal informed OFAC of Libya's ownership of Oilinvest in 1990. OFAC thereafter determined that Oilinvest was the "government of Libya" for the purpose of the LSRs. As a result, OFAC listed plaintiff as an SDN in the Federal Register on August 5, 1991. At all times from this date, plaintiff was listed as an SDN. *Id.* Plaintiff's personal assets, including the stock options, were frozen as a result of this designation. The options were set to expire on March 19, 1997. Plaintiff applied for licenses under the LSRs in order to sell or exercise his stock options in Coastal, but OFAC refused his applications. As a result, plaintiff brought a lawsuit in the United States District Court for the Southern District of Texas (District Court) on July 17, 1996, arguing that the LSRs were invalid and that plaintiff's status as an SDN was improper. Plaintiff alleged violations of a number of his constitutional rights as well. Plaintiff also asked the court to issue injunctive relief that would force OFAC to allow the exercise of his stock options. In addition, during the litigation plaintiff requested that OFAC allow the options to be exercised and then immediately placed in a blocked account. OFAC refused this request. Plaintiff asked the District Court for leave to amend his complaint to include his Fifth Amendment takings claim, but the District Court denied this motion, stating that such amendment would be futile because he could not state a viable takings claim. *Paradissiotis v. Rubin,* No. H–96–2314 (S.D.Tex. 1997) (order denying motion to vacate opinion, or, in the alternative, for reconsideration, and motion to amend complaint) (*Paradissiotis I* ). The District Court granted summary judgment for the named government officials on all counts on March 17, 1997, and two days later the options formally expired.

---

1. Because plaintiff is a citizen of a foreign country, the court must determine whether he has standing to bring a claim before this court. The pertinent statutory rule is found under the section entitled "Aliens' privilege to sue":

    (a) Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction.

28 U.S.C. § 2502 (1994). By sworn affidavit of Cypriot lawyer Christos J. Vakis, who has practiced law in Cyprus for over 40 years and has served as a judge in that country, the Constitution of Cyprus allows U.S. citizens the reciprocal right to sue in Cypriot courts. Defendant does not dispute Mr. Vakis' statement. Standing is therefore satisfied.

Plaintiff appealed the District Court's decision to the United States Court of Appeals for the Fifth Circuit (Fifth Circuit), and the Fifth Circuit affirmed the District Court's ruling on all counts except plaintiff's Fifth Amendment takings claim. *Paradissiotis II*, 171 F.3d at 989. The Fifth Circuit held that the District Court in general has no jurisdiction over claims against the government exceeding $10,000.00, and that the United States Court of Federal Claims was the proper venue for such claims. *Id.; see* 28 U.S.C. § 1346(a)(2) (1994). The Fifth Circuit therefore vacated the District Court's judgment as to plaintiff's takings claim. *Id.*[2] Plaintiff then brought a claim in this court on June 22, 2000, alleging a compensable taking of his personal property under the Fifth Amendment.

*Discussion*

## I. Motion to Dismiss for Failure to State a Claim

Defendant has brought a motion pursuant to RCFC 12(b)(4), for failure to state a claim upon which relief may be granted. The court will grant such a motion only if it appears beyond a doubt that plaintiff has failed to allege facts sufficient to support his claim. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mostowy v. United States*, 966 F.2d 668, 672 (Fed.Cir. 1992). In ruling on a RCFC 12(b)(4) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff. *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Gould, Inc. v. United States*, 935

F.2d 1271, 1274 (Fed.Cir.1991)). Nevertheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). "[L]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *Blaze Constr., Inc. v. United States*, 27 Fed.Cl. 646, 650 (1993) (internal quotations omitted).

Plaintiff argues that because defendant prevented plaintiff from exercising his stock options, and those options eventually expired, such governmental action constituted a taking of his property within the meaning of the Fifth Amendment. "The Takings Clause of the Fifth Amendment prohibits the taking of private property for public use without just compensation." *Rockefeller Ctr. Props. v. United States*, 32 Fed.Cl. 586, 590 (1995). The "Fifth Amendment's guarantee ... [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), *quoted in Penn Cent. Transp. v. City of New York*, 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Two main types of compensable regulatory takings have been recognized. The first type involves government action resulting in the actual physical invasion or seizure of property, or the permanent occupation of such property. When such government action occurs, "no matter how minute the intrusion," just compensation must be paid to the owner of the property "without case-specific inquiry into the public interest advanced in

---

2. Because the Fifth Circuit vacated the District Court's holding on plaintiff's takings claim, and did not take up the question of the alleged taking itself, the portions of the District Court's holding concerning that claim have no preclusive effect on this court's takings analysis. *See Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 172 (D.C.Cir.1981). Yet, the District Court and the Fifth Circuit made findings on factual issues that were necessary to the disposition of the other claims, and some of these findings of fact are pertinent to the analysis of the takings issue in this case. *Paradissiotis II*, 171 F.3d 983. Pursu-

ant to the doctrine of issue preclusion, the court will not revisit such findings. *See Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1366 (Fed. Cir.2000) (explaining the test for issue preclusion); BLACK'S LAW DICTIONARY 746 (5th ed.1979) (defining an "issue" for purposes of the doctrine as "any fact, question or matter in issue"). If plaintiff has alleged in his complaint other facts not involved in the previous proceedings but that are pertinent to his takings claim, however, such facts will not be precluded from this court's analysis, as they are part of the larger takings question that has not been decided by a court of competent jurisdiction.

support of the restraint . . . ." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

■ The second type of taking does not involve physical invasion or seizure of property. Instead, it concerns action that affects an owner's use of property, and is based on the "general rule . . . that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922), *quoted in 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1580 (Fed.Cir.1995). The government need not make use of or take title in the property at issue for a taking to occur: "Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking." *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945), *quoted in Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *Aris Gloves, Inc. v. United States*, 190 Ct.Cl. 367, 374, 420 F.2d 1386 (1970). While the Supreme Court of the United States has found conclusively that such regulatory takings may and do occur, it has not instituted a "set formula" for determining when governmental regulatory action

becomes a compensable taking. *Penn Cent. Transp.*, 438 U.S. at 124, 98 S.Ct. 2646. Instead, because of the essentially factual nature of a takings claim, each claim is analyzed on an ad hoc, case-by-case basis. *Ruckelshaus*, 467 U.S. at 1006, 104 S.Ct. 2862 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)).[3] The Supreme Court nevertheless has identified significant factors for consideration in these cases, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (quoting *Penn Cent. Transp.*, 438 U.S. at 124, 98 S.Ct. 2646) (internal quotations omitted).[4] When one of these factors is so overwhelming as to decide conclusively the validity of a regulatory takings claim, that factor may dispose of the claim altogether. *See Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862.

## A. Economic Impact of the Regulation on Claimant

Defendant concedes that there has been a rather severe economic impact on plaintiff's stock options. They have expired, and there-

3. Although takings claims are invariably fact-intensive in their analysis, this does not preclude judgment as a matter of law, whether under the summary judgment standard or the standard for failure to state a claim. *See 767 Third Ave.*, 48 F.3d at 1580 (citing *Chang v. United States*, 859 F.2d 893, 898 (Fed.Cir.1988)); *Rockefeller*, 32 Fed.Cl. at 590 n. 9; *Buffalo Nat'l Bank v. United States*, 26 Cl.Ct. 1436, 1440 (1992). This takings case is especially appropriate for a determination on the pleadings, as the pertinent factual content has been previously adjudicated. *See* Note 2, *supra; Paradissiotis II*, 171 F.3d 983.

4. It is clear that these factors as first described in *Penn Central Transportation* were not divided into three parts, but two. The test consisted of the "economic impact" and "character" factors, of which the "economic impact" factor had a further, more specific part: "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations." *Penn Cent. Transp.*, 438 U.S. at 124, 98 S.Ct.

2646. The use of "particularly" indicates that the "reasonable expectation" factor of the test is a subsection of the overall economic impact analysis, and not a stand-alone factor. Thus, the Supreme Court explained that a proper analysis of economic impact in a regulatory takings case would include consideration of the diminution of the known, present value of property as well as the expectations of value based on the development or intended use of the property. Subsequent Supreme Court cases, however, have divided the "economic impact" language from the "reasonable expectations" language, creating a new factor. *See, e.g., Connolly*, 475 U.S. at 225, 106 S.Ct. 1018; *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862; *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Kaiser Aetna*, 444 U.S. at 175, 100 S.Ct. 383. The United States Court of Appeals for the Federal Circuit has adopted this three-factor test, *see, e.g., 767 Third Ave.*, 48 F.3d at 1580, despite the test's likely alteration of the analysis required in determining regulatory takings. This court will therefore apply the same test. *See Rockefeller*, 32 Fed.Cl. at 591.

fore are a total loss. Plaintiff, however, has brought a regulatory takings claim based on frustration of contract. Plaintiff had a contractual agreement with Coastal for the exercise of stock options. Although contracts do qualify as property for the interests of Fifth Amendment takings analysis, such contracts are subject to the valid powers of the United States government residing in the executive and legislative branches. *Connolly*, 475 U.S. at 223–24, 106 S.Ct. 1018 ("[W]hen contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity."); *Chang v. United States*, 859 F.2d 893, 895 (Fed.Cir.1988). A contract will not defeat in any case a lawfully propagated statute or regulation. *Chang*, 859 F.2d at 895. "For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Connolly*, 475 U.S. at 224, 106 S.Ct. 1018, *quoted in Chang*, 859 F.2d at 895.

Here, plaintiff's property was frozen pursuant to the LSRs and the IEEPA. It is not disputed that the freezing of plaintiff's stock options and the refusing of licenses to exercise those options were lawful. It is clear, therefore, that plaintiff's assets were "in every sense subordinate to the President's power under the IEEPA." *Dames & Moore v. Regan*, 453 U.S. 654, 674 n. 6, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). This concept applies to takings analysis with equal weight:

> A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? .... [W]as it ever imagined this was taking private property without compensation or without due process of law?

*Knox v. Lee*, 12 Wall. 457, 79 U.S. 457, 551, 20 L.Ed. 287 (1870), *quoted in Chang*, 859 F.2d at 897. Despite the fact that plaintiff suffered obvious economic loss, therefore, this factor is not enough to sustain plaintiff's claim of a compensable taking.

## B. Interference with Investment–Backed Expectations

■ "A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862 (internal quotations omitted). The phrase "interference with distinct investment-backed expectations" is somewhat "cryptic," but has been interpreted essentially as

> a concept of fundamental justice and fair play, ... suggest[ing] that even valid regulatory action can result in a taking if government shifts too heavy a burden upon a few individuals, and does so in a sudden and unanticipated manner so that those adversely affected have little opportunity to protect themselves in the marketplace.

*Shanghai Power Co. v. United States*, 4 Cl. Ct. 237, 242 (1983), *aff'd mem.*, 765 F.2d 159 (Fed.Cir.), *cert. denied*, 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985). The court must decide whether the governmental action involved "can be characterized as novel and unexpected," or whether it is "within traditional boundaries" of the exercise of government power. *Id.* at 243. In general, when a claimant is charged with the knowledge that its type of property interest is regulated by the government at intervals, and that it is certain that the government will use its power to implement or modify such regulation given the proper circumstances, no reasonable expectation of non-interference exists. *Ruckelshaus*, 467 U.S. at 1006–07, 104 S.Ct. 2862 (explaining that the known possibility that the EPA would eventually disclose trade secret materials submitted by a claimant meant no reasonable expectation); *Connolly*, 475 U.S. at 226–27, 106 S.Ct. 1018 (holding that no reasonable expectation existed when a claimant entered into agreements already regulated by existing pension law and subsequently the government amended such regulations).

When claims for compensable takings concern governmental action taken pursuant to the IEEPA that affects contracts dealing with foreign countries, the test for what is a reasonable expectation becomes better defined. When a claimant has entered into

foreign commerce, "the possibility of changing world circumstances and a corresponding response by the United States government can never be completely discounted." *Chang*, 859 F.2d at 897. Claimants who deal in foreign commerce most often have knowledge at the time of contracting that foreign relations between this country and a foreign country might sour, and that the government might intervene and interfere with contractual rights. Such knowledge is enough to extinguish any reasonable expectation for takings purposes. *See 767 Third Ave.*, 48 F.3d at 1580–81 (holding that a lessor to the government of the former Yugoslavia had no reasonable expectation of non-interference even ten years prior to eventual turmoil prompting U.S. freezing of Yugoslavian assets, mere existence of IEEPA and previous use of its provisions sufficed); *Chang*, 859 F.2d at 897; *Rockefeller*, 32 Fed.Cl. at 592–93 (explaining that a claimant had no reasonable expectation that its contracts with Yugoslavia would be free from government interference pursuant to IEEPA, despite the fact that contracts were signed 17 years before turmoil, and two years before the enactment of IEEPA, as Trading With the Enemy Act enabled similar governmental interference); *Shanghai*, 4 Cl.Ct. at 245.

■ Plaintiff maintains nonetheless that he could not have possibly foretold the exact progression of events that caused his situation to degenerate to the point that he became an SDN. As is clear from the settled law laid out above, plaintiff greatly overstates the threshold for finding that a claimant had no reasonable expectation of government non-interference. *See 767 Third Ave.*, 48 F.3d at 1579, 1580–81 (finding unpersuasive a claimant's argument that it could not predict the future with specificity). In the foreign relations sphere, a claimant need only have knowledge of a general possibility that its contracts may be affected by the United States government in order for the court to find that no reasonable expectation of non-interference existed. *Chang*, 859 F.2d at 897. Indeed, in *Chang*, the United States Court of Appeals for the Federal Circuit (Federal Circuit) decided the reasonable expectation issue based on the same factual situation between Libya and the United

States in 1985, holding that it was public knowledge that the two countries were embroiled in strained and volatile relations at the time. *Id.* In that case, the Federal Circuit charged such knowledge to claimants who had contractual rights in Libya, and therefore found that the claimants had no reasonable expectation of government non-interference. *Id.*

■ Here, plaintiff dealt with elements of the government of Libya for at least seven years before he was designated an SDN. He worked for companies that were owned by, or did business expressly on behalf of, the government of Libya. When he received the stock options from Coastal in 1985, plaintiff could not help but be aware of the problems between Libya and the United States. The situation was public knowledge, and plaintiff's deep involvement with the government of Libya put him in a position to know substantially more than the average observer about developing relations between the two countries. In fact, plaintiff still had some time to consider his position in relation to the government of Libya even after HICL became Libyan-owned, as there was a period of time between the takeover of HICL and the OFAC action that blocked his assets. Yet plaintiff took no steps to protect his interests. Predictably, plaintiff's stock options were eventually frozen pursuant to the LSRs, and plaintiff was denied a license by defendant for the purpose of exercising those options. Plaintiff cannot show that he did not expect any interference due to his close dealings with Libya, because of the "overwhelming public knowledge of strained and deteriorating relations between [the United States and Libya]" for the entire seven years that he owned the options. *Id.* The consideration of this factor therefore "militates in favor of a finding that no taking occurred." *Rockefeller*, 32 Fed.Cl. at 592.

## C. Character of Governmental Action

■ In settled Fifth Amendment jurisprudence, "a taking is more readily ... found when the interference with property can be characterized as a physical invasion by the government ... than when interference

arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Shanghai,* 4 Cl.Ct. at 242 (quoting *Penn Cent. Transp.,* 438 U.S. at 124, 98 S.Ct. 2646) (internal quotations omitted). A regulation that burdens private property may "constitute a taking if not reasonably necessary to the effectuation of a substantial public purpose . . . ." *Penn Cent. Transp.,* 438 U.S. at 127, 98 S.Ct. 2646 (internal quotations omitted). In the area of foreign relations, the government, and especially the executive branch, is given "generous scope to accomplish its purpose," *Propper v. Clark,* 337 U.S. 472, 481, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949), and may cause extreme difficulties for foreign countries and their citizens in order to preserve the security of the United States. *Tran Qui Than v. Regan,* 658 F.2d 1296, 1304 (9th Cir.1981); *see also Belk v. United States,* 12 Cl.Ct. 732, 735 (1987) (citing *United States v. Curtiss–Wright Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936), and stating that when foreign relations are at issue, in takings cases as well as others, the president will not be questioned on whether his actions are for the public good), *aff'd,* 858 F.2d 706 (Fed.Cir. 1988).

The IEEPA gives the President the authority to "deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States . . . ." 50 U.S.C. § 1701(a). The Federal Circuit has held unequivocally that the implementation of the IEEPA serves to protect national security, and specifically "the imposition of the Libyan Sanction Regulations substantially advances legitimate state interests." *Chang,* 859 F.2d at 896; *see also Rockefeller,* 32 Fed.Cl. at 591 ("Clearly, the public interest to be served by this scheme

[the IEEPA] and actions taken pursuant to it are of paramount importance."). In this case, the government did not take possession of plaintiff's property, and defendant certainly never made any use of the property. Because it is well-settled that the LSRs serve an unassailable national security and public policy interest, this factor also makes the court reluctant to find a compensable taking. It is unfortunate that plaintiff lost his property outright.[5] The preservation of the national security interest of the United States nevertheless greatly outweighs plaintiff's loss.

Plaintiff argues that while the action taken by defendant in this case is legal, the facts of the case do not correlate with those of the other regulatory takings cases considered above. Indeed, plaintiff is correct that in the other cases dealing with takings allegedly caused by governmental action pursuant to the IEEPA, the claimants involved had suffered only temporary blocking of, and de minimis harm to, their property, *e.g., Rockefeller,* 32 Fed.Cl. at 594, or were not the direct subject of sanctions, *e.g., 767 Third Ave.,* 48 F.3d at 1581–82 (citing *Omnia Commercial Co. v. United States,* 261 U.S. 502, 511, 43 S.Ct. 437, 67 L.Ed. 773 (1923) (explaining that damage to property interests will not amount to a taking when the regulation that caused the loss was not directed at the owners of the interests)). Plaintiff, on the other hand, has irreparably lost his property due to the direct actions of defendant in listing him as an SDN and denying his requests for a license to exercise his stock options. Plaintiff maintains that these differences in the facts show the character of this blocking and "destruction" of plaintiff's stock options to be a more severe governmental action, and thus there exists a compensable taking in this case where none was found in the previous cases.

5. Plaintiff argues that defendant could have prevented the loss of his property by allowing the creation of a blocked account for the deposit of the stock option proceeds. Simply because defendant may have been able to take more steps to preserve plaintiff's property, however, does not place any responsibility on defendant to take such steps. Defendant was at all times within the lawful bounds of the LSRs in blocking plaintiff's assets and denying his request for licenses. *Cf. Aris Gloves,* 190 Ct.Cl. 367, 420 F.2d 1386 (holding that United States government's failure

to recover compensation from U.S.S.R. for Soviet appropriation of U.S.-owned factory in East Germany after World War II was not a taking, as government acted within applicable law to maintain national interests); *Rockefeller,* 32 Fed.Cl. at 594 (finding government's failure to allow the eviction of Yugoslavian state-controlled airline from office space after airline's funds were blocked and use of the space was prohibited by United States government did not amount to a taking, claimant's cause of action was against airline, not United States).

These assertions, however, do not aid plaintiff's case. As has been discussed, there is no question as to the propriety of the President's implementation of the IEEPA or OFAC's creation of the LSRs. There is similarly no doubt that such measures and actions preserve national security. To be certain, the defense of national security is the epitome of promoting the public good of the United States. *See generally, Miranda v. Sec'y of Treasury*, 766 F.2d 1 (1st Cir.1985) (public interest served not only by blocking assets of Cuban national, but also by refusing to grant license for personal asset transfer). Plaintiff has suffered loss and has been inconvenienced by the LSRs, but that is exactly what the LSRs are lawfully designed to do: plaintiff is for all practical purposes treated as the government of Libya. To grant him the money value of his property would greatly harm the effectiveness of the LSRs. Finding a taking would not mean mere circumvention of the provisions of the IEEPA and LSRs; it would mean their evisceration. The proper protection of this country's national interests against foreign threats "may destroy the worth of contracts." *Knox*, 79 U.S. at 551. The exercise of this protection is not a taking. Fairness and justice do not require the public of the United States to shoulder the responsibility for the losses sustained by a part of a government that the United States has lawfully labeled a threat to its national security.

## II. *Motion to Amend Complaint*

Plaintiff has brought a motion for leave to amend his complaint if the court finds that plaintiff has failed to state a claim capable of remedy. The rules of the court set a permissive standard for amendment of claims. RCFC 15(a) ("[L]eave [to amend] shall be freely given when justice so requires."). A motion to amend a complaint will be denied, however, when such amendment would be futile. *Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1404 (Fed.Cir.1989). Plaintiff simply cannot change the dispositive facts of his case. First, plaintiff is charged with the general knowledge that relations between Libya and the United States could become and were strained while he possessed the stock options. Second, there is no dispute

that the LSRs were properly applied and that they serve an overwhelming public interest in this country. Plaintiff cannot alter these findings with additional or altered pleadings, and therefore any amendment would be futile. The court will deny plaintiff's motion for leave to amend.

### Conclusion

For the above-stated reasons, defendant's actions taken pursuant to the IEEPA and the LSRs serve to preserve this country's national security, an interest of paramount importance to the public good. In addition, due to plaintiff's deep involvement with the government of Libya at all times pertinent to this litigation, plaintiff had no reasonable expectation of government non-interference with regard to his stock options. No compensable taking exists in this case. Defendant's motion to dismiss for failure to state a claim upon which relief may be granted is ALLOWED. Plaintiff's motion for leave to amend his complaint is DENIED. The Clerk is directed to dismiss the complaint. No costs.

IT IS SO ORDERED.